**In re Richard J. DONNAY and Sandra A. Donnay, Debtors.**

**Michael FARRELL, as the Bankruptcy Trustee for the ESTATE OF Richard J. DONNAY and Sandra A. Donnay, Plaintiff,**

v.

**Mark WURM and Todd Wurm, Defendants.**

**Bankruptcy No. 4–94–0341.**
**Adv. No. 4–94–461.**

United States Bankruptcy Court,
D. Minnesota.

June 28, 1995.

Lowell P. Bottrell, Anderson & Bailly, Fargo, ND, for trustee.

Edward W. Bergquist, Minneapolis, MN, for Mark Wurm and Todd Wurm.

Richard Salmen, St. Paul, MN, for debtors.

Michael J. Farrell, Trustee, Barnesville, MN.

*MEMORANDUM ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for hearing before the undersigned on the 26th day of January, 1995 on plaintiff's motion for an order granting summary judgment. Appearances were as follows: Lowell Bottrell for the plaintiff, Michael Farrell; Edward Bergquist for the defendants, Mark and Todd Wurm; and Richard Salmen for the debtors, Richard and Sandra Donnay.

The Court having read the papers, heard the arguments of counsel, and being duly advised in the premises, concludes that the plaintiff's motion for summary judgment shall be granted in part and denied in part.

*FACTS*

1. The Debtors, Richard and Sandra Donnay (collectively "Debtors"), are married. Richard Donnay ("Debtor") was in the business of buying grain from local farmers and reselling the grain to commodity firms, including Pillsbury Company ("Pillsbury") and Peavey Grain Company ("Peavey"). Debtor was a public grain warehouse operator within the meaning of Minn.Stat. § 232.21, subdivision 12.

2. Roy Wurm was a grain farmer and the father of defendants, Mark and Todd Wurm (collectively "the Wurms"). Throughout the pertinent years, the Wurms operated a sizable 1,000 acre family farm in Maple Lake, Minnesota. The Wurms shared all aspects of the operations, including decision-making. On March 13, 1993, Roy Wurm died unexpectedly in an accident. Following his untimely death, Mark and Todd Wurm inherited or were assigned the rights to the contracts involved in this case.

3. Debtor and the Wurms did business together for a number of years. They engaged in a series of contracts pursuant to which the Wurms would agree to sell their crops to Debtor on a "forward contract" basis. In essence, the Wurms agreed to deliver their crops to locations specified by Debtor and Debtor agreed to pay the Wurms a given price per bushel of crop. Debtor then brokered sales to commodities companies and the Wurms paid Debtor a commission. Typically, Debtor arranged for the sale of the crops to Peavey or Pillsbury, whose elevators were located in the Twin Cities area. Debtor at times also sold the crops to others. Sometimes Debtor instructed the Wurms to deliver the crops to Peavey and Pillsbury elevators, and other times Debtor used his own trucks to pick up the crops at the Wurms' farm. For purposes of this motion, the location of delivery is unimportant.

4. No written agreement existed between the Wurms and Peavey or Pillsbury suggesting the companies were parties to these transactions between Debtor and the Wurms.

5. The contracts between Debtor and the Wurms were virtually identical. Debtor agreed to pay the Wurms a set price per bushel for the crops. The first payment was

almost always to be made well after delivery and was at a premium fixed price which escalated over time. That is, rather than immediately receiving payment for all of the crops, the Wurms would delay their receipt of a payment for part of the proceeds of sale. At periodic intervals, the parties adjusted the price to be paid in the future. They did so by changing, in handwritten notations, the terms of the sale on the face of each contract. The price adjustment was referred to sometimes as a "premium" and other times as "interest." Most commonly, however, the parties simply referred to the adjustment as a percentage increase over each year. The Wurms were free to take their money out, including the fixed premium earned, or they could agree to leave the money in and earn an additional premium as documented by another change to the contract. The longer the Wurms waited for payment, the more money they would be paid for their crops.

6. These arrangements look suspiciously like an investment account, pursuant to which the Wurms deposited with Debtor the proceeds from the sale of their crops and Debtor paid interest to the Wurms. Debtor has filed an affidavit in which he describes the arrangement in precisely this way. The Wurms called the additional payment a "premium," but both Debtor and the Wurms viewed the payments as interest. If Debtor's version of the facts is correct, the apparent benefit to be derived from such an arrangement was the fact that the Wurms received a very high return on their money without notice to the IRS.

7. On January 21, 1994, Debtors filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code and Michael Farrell ("Trustee") was appointed the trustee. After the bankruptcy filing, Debtor ceased operating the elevator and grain storage business.

8. On April 13, 1994, the Wurms filed a proof of claim (No. 81) in the amount of $893,325.78 against Debtors. The Wurms' claim is based on the various contracts entered into between Debtor and the Wurms. Specifically, the claim seeks 1) unpaid principal and unpaid premiums (or interest) for the sums deposited over the various years the parties did business, 2) payment for the 1993 crop with no claim for interest, and 3) a refund of a small sum relating to the purchase of fuel.

9. The Wurms have also filed a claim with the Minnesota Department of Agriculture against the grain storage bond and grain sales bond of Debtor's business seeking payment for their 1993 crops.

10. The claim filed in bankruptcy court is as follows:

| Year | Crop | Bushels | Price/bu | Unpaid Prin. | Unpaid Premium | Total |
|------|------|---------|----------|--------------|----------------|-------|
| 1985 | Corn | 10,092.13 | $2.2225 | $22,441.58 | $35,791.22 | $58,232.80 |
| 1986 | Corn | 25,000.00 | $2.035 | $50,875.00 | $68,213.99 | $119,088.99 |
| 1987 | Corn | 10,327.13 | $1.90 | $19,450.54 | $20,792.06 | $40,242.60 |
| 1988 | Corn | 15,091.88 | $1.9825 | $29,919.65 | $29,904.36 | $59,824.01 |
| 1989 | Beans | 13,274.35 | Varied | $92,549.21 | $66,760.40 | $159,309.61 |
| 1990 | Beans | 8,134.66 | $5.90 | $47,994.49 | $28,426.15 | $76,420.64 |
| 1990 | Corn | 7,686.43 | $2.775 | $21,329.84 | $12,173.10 | $33,502.94 |
| 1990 | Corn | 26,383.88 | $2.36 | $62,265.96 | $33,507.07 | $95,773.03 |
| 1992 | Corn | 26,550.71 | $2.25 | $59,739.10 | $ 1,792.17 | $61,531.27 |
| 1993 | Beans | 9,907.50 | Varied | $59,940.40 | | $59,940.40 |
| 1993 | Corn | 45,286.86 | Varied | $93,460.78 | | $93,460.78 |
| 1993 | Corn | 10,550.87 | $2.75 | $29,014.89 | | $29,014.89 |
| **TOTAL** | | | | $588,981.44 | $297,360.52 | $886,341.96 |

1993 Prepaid Fuel <$6,983.82>

**GRAND TOTAL** $893,325.78

The contracts at issue are more fully described below:

a) *1985 Corn Contract.* Pursuant to Contract No. 1661 dated November 11, 1985, the Wurms agreed to sell 10,092.13 bushels of corn to Debtor at an initial price of $2.32 per bushel for a total price of $22,441.58. Delivery was set for November, 1985. The Wurms delivered the corn between November 20, 1985 and November 22, 1985. Pursuant to the contract, payment for the corn at $2.32 per bushel was deferred to March 3, 1986. The parties later modified the contract to provide for payment on April 15, 1986 at $2.37 per bushel. Thereafter, over the years, the Wurms and Debtor continued to modify the contract to reflect a different price for the corn. The parties sometimes changed the bushel price, while other times they assigned a different premium to be earned on the unpaid corn.[1] The following graph illustrates the price modifications. The date reflects the future date to which the Wurms would receive the stated price or premium. For example, in 1993 the parties agreed to modify the contract to provide for 12.50 percent interest between April 20, 1993 and April 20, 1994.[2]

| Date | Price or Premium | |
|---|---|---|
| 06/15/86 | $2.42 | per bushel |
| 09/02/86 | $2.49 | " " |
| 01/06/87 | $2.57 | " " |
| 05/05/87 | $2.65 | " " |
| 10/01/87 | $2.75 | " " |
| 01/01/88 | $2.82 | " " |
| 04/01/88 | $2.89 | " " |
| 09/01/88 | $2.99 | " " |
| 04/15/89 | $3.19 | " " |
| 04/15/90 | 12.50% | interest |
| 04/15/91 | 14.70 | " " |
| 04/20/92 | 13.50% | premium |
| 04/20/93 | 13.20% | " " |
| 04/20/94 | 12.50% | " " |

The Wurms' claim seeks $22,441.58 in unpaid principal and $35,791.22 in unpaid premium for this crop, for a total of $58,232.80.

b) *1986 Corn Contract.* Pursuant to Contract No. 1671 dated January 15, 1986, the Wurms agreed to sell 25,000 bushels of corn to Debtor at an initial price of $2.035 per bushel. Delivery was set for October, 1986. The Wurms delivered the corn between October 9, 1986 and October 15, 1986. The contract deferred payment for the corn until May 5, 1987 with a changed price of $2.145 per bushel. Thereafter, over the years, the parties modified the price as follows:

| Date | | Price or Premium | |
|---|---|---|---|
| 10/01/87 | 10¢ premium | $2.245 | per bushel |
| 01/01/88 | 7¢ premium | $2.215 | " " |
| 04/01/88 | 7¢ premium | $2.285 | " " |
| 09/01/88 | 10¢ premium | $2.385 | " " |
| 04/15/89 | 1% per month | $2.554 | " " |
| 04/15/90 | | 12.50% | per year |
| 04/15/91 | | 14.70% | interest |
| 04/20/92 | | 13.50% | premium |
| 04/20/93 | | 13.20 | " " |
| 04/20/94 | | 12.50 | " " |

The Wurms' claim seeks $50,875.00 in unpaid principal and $68,213.99 in unpaid premium for this crop, for a total of $119,088.99.

c) *1987 Corn Contract.* Pursuant to Contract No. 1740 dated June 23, 1987, the Wurms agreed to sell 10,237.13 bushels of corn to Debtor at a price of $1.70 per bushel. Delivery was set for June, 1987. The Wurms delivered the corn between June 8, 1987 and June 24, 1987. The contract deferred payment for the corn until April 1, 1988 at a price of $1.90 per bushel. Thereafter, over the years, the parties modified the price as follows:

| Date | Price or Premium | |
|---|---|---|
| 09/1/88 | $2.00 | per bushel |
| 04/15/89 | $2.14 | " " |
| 04/15/90 | 12.50% | interest |
| 04/15/91 | 14.70% | " " |
| 04/20/92 | 13.50 | " " |
| 04/20/93 | 13.20% | premium |
| 04/20/94 | 12.50 | " " |

The Wurms' claim seeks $19,450.54 in unpaid principal and $20,792.06 in unpaid premium for this crop, for a total of $40,242.60.

d) *1988 Corn Contract.* Pursuant to Contract No. 1813 (and earlier versions numbered 1749 and 1784) dated July 27, 1988, the Wurms agreed to sell 47,103.21 bushels of corn to Debtor. Of this amount, 25,000 bushels were to be sold at $1.96 per bushel, and 22,103.21 bushels were to be sold at $2.015 per bushel. Delivery was set for June or July, 1988. The Wurms delivered the corn between June 1, 1988 and July 8, 1988. The contract deferred initial payment until April 15, 1989 at a premium of 1 percent per

---

1. The Wurms and Debtor modified all subsequent contracts in this same manner.

2. Thus, while the contracts provide for a premium through 1994, the parties last amended this and every other contract in 1993.

month over the June, 1988 price. Contract No. 1821 dated December 13, 1988 later replaced Contract No. 1813. The new contract provided for payment on April 15, 1990 at a "premium over April 15, 1989 at 12.5% interest." Subsequently, the parties modified the price as follows:

| Date | Price or Premium | |
|------|------------------|---|
| 04/15/91 | 14.70% | interest |
| 04/20/92 | 13.50% | premium |
| 04/20/93 | 13.20% | " " |
| 04/20/94 | 12.50% | " " |

After allowances for credit for payments Debtor made on this contract (including $113,000 as set forth in Paragraph 14), the Wurms' claim seeks $29,919.65 in unpaid principal and $29,904.36 in unpaid premium for this crop, for a total of $59,824.01.

e) *1989 Soybean Contracts.* In 1989, Debtor and the Wurms entered into two contracts covering the 1989 soybean crop. Pursuant to Contract No. 1826 dated March 30, 1989, the Wurms agreed to sell 10,000 bushels of soybeans to Debtor at $7.03 per bushel. Pursuant to Contract No. 1837 dated April 26, 1989, the Wurms agreed to deliver an additional 3,000 bushels of soybeans at a purchase price of $6.795 per bushel. Delivery on both contracts was set for October, 1989. The Wurms delivered the soybeans between October 2, 1989 and October 11, 1989. Both contracts deferred initial payment until April 15, 1990, at differing prices set forth below. Over the years, the parties adjusted the price as follows:

Contract # 1826

| Date | Price or Premium | |
|------|------------------|---|
| 04/15/90 | $7.37 | per bushel |
| 04/15/91 | 14.50% | interest |
| 04/20/92 | 13.50% | premium |
| 04/20/93 | 13.20% | " " |
| 04/20/94 | 12.50% | " " |

Contract # 1837

| Date | Price or Premium | |
|------|------------------|---|
| 04/15/90 | $7.135 | per bushel |
| 04/15/91 | 14.50% | interest |
| 04/20/92 | 13.50% | premium |
| 04/20/93 | 13.20% | " " |
| 04/20/94 | 12.50% | interest |

The Wurms' claim seeks $92,549.21 in unpaid principal and $66,760.40 in unpaid premium for the crop covered by these two contracts, for a total of $159,309.61. The Wurms' claim

does not further divide the amounts between the two contracts.

f) *1990 Soybean Contract.*[3] Pursuant to Contract No. 1752 dated March 13, 1990, the Wurms agreed to sell 8,134.66 bushels of soybeans to Debtor at $5.90 per bushel. Delivery was set for June, 1990. The Wurms delivered the soybeans between June 14, 1990 and June 20, 1990. The contract deferred initial payment to April 15, 1991 at a 63 cents per bushel premium or $6.53. Thereafter, over the years, the parties adjusted the price as follows:

| Date | Price or Premium | |
|------|------------------|---|
| 04/20/92 | 13.50% | premium |
| 04/20/93 | 13.20% | " " |
| 04/20/94 | 12.50% | " " |

The Wurms' claim seeks $47,994.49 in unpaid principal and $28,426.15 in unpaid premium for this crop, for a total of $76,420.64.

g) *1990 Corn Contract.* Pursuant to Contract No. 1768 dated July 25, 1990, the Wurms agreed to sell 7686.43 bushels of corn to Debtor at $2.775 per bushel. Delivery was set for July, 1990. The corn was delivered between July 5, 1990 and July 11, 1990. The contract deferred payment until April 15, 1991 and the price changed to $3.04 per bushel. Thereafter, over the years the parties modified the price as follows:

| Date | Price or Premium | |
|------|------------------|---|
| 04/20/92 | 13.50% | premium |
| 04/20/93 | 13.20% | " " |
| 04/20/94 | 12.50 | " " |

The Wurms' claim seeks $21,329.84 in unpaid principal and $12,173.10 in unpaid premium for this crop, for a total of $33,502.94.

h) *1990 Corn Contract.* Pursuant to Contract No. 1753 dated March 13, 1990, the Wurms agreed to sell 35,000 bushels of corn to Debtor at a price of $2.36 per bushel. Delivery was set for November, 1990. The Wurms actually delivered only 26,383.88 bushels of corn on November 30, 1990. The settlement sheets provided that the contract would be divided into three separate sales prices: 14,144.31 bushels would be sold at $2.36; 12,000 bushels would be sold at $2.54; and 239.52 bushels would be sold at $2.11. Initial payment was to be deferred to April

---

**3.** In 1990, Debtor and the Wurms entered into three contracts, one relating to soybeans and two relating to corn. No contracts exist for 1991.

20, 1991 at a 13 cent per bushel premium. Thereafter, over the years, the parties adjusted the price as follows:

| Date | Price or Premium |
|---|---|
| 04/20/92 | 13.50% premium |
| 04/20/93 | 13.20 " " |
| 04/20/94 | 12.50 " " |

The Wurms' claim seeks $62,265.96 in unpaid principal and $33,507.07 in unpaid premium for this crop, for a total of $95,773.03.

i) *1992 Corn Contract.* In the fall of 1992, the Wurms and Debtor entered into a special arrangement pursuant to which the Wurms supplied 26,550.71 bushels of corn to a Twin Cities elevator in order to hastily fill a barge. The parties agreed that the price could be set in April, 1993 and then later deferred the price setting on that date. On October 15, 1993, they set the price at $2.25 per bushel for a total sales price of $59,739.10. Payment was to be made at 12 percent interest on January 15, 1994. The interest charged was $1,792.17 for a total payment of $61,531.27. This was 1992 corn, delivered in the fall 1992, priced in the fall of 1993, and not paid for as of the petition date. The Wurms' claim seeks $59,739.10 in unpaid principal and $1,792.17 in unpaid premium for this crop, for a total of $61,531.27.

j) *The 1993 Crop*

1. *1993 Soybeans.* Between October 1, 1993 and October 14, 1993, the Wurms delivered 17,125.68 bushels of soybeans to Debtor under a contract which required payment of interest on the unpaid balance at 12 percent per month commencing October 15, 1993. The Wurms' claim seeks payment of $59,940.40 of unpaid principal for this crop.

2. *1993 Corn.* In October 1993, the Wurms contracted to deliver approximately 44,000 bushels of corn at prices ranging from $2.15 to $2.40 per bushel. The Wurms delivered 44,278 bushels of corn for a total purchase price of $93,460.78. The contract provides for interest on corn delivered but not paid for commencing on November 1, 1993 at an interest rate of 12 percent per annum. The Wurms' claim seeks payment in the amount of $93,460.78 in unpaid premium for this crop.

3. *1993 Corn.* On November 5, 1993, the Wurms and Debtor contracted for the delivery of corn from their 1993 and 1994 crops at a price of $2.855 per bushel for 44,000 bushels, with a June, 1994 delivery. The price was subsequently changed to $2.75 on deliveries to be made during the winter of 1994. However, some deliveries started to occur in the fall of 1993 when approximately 10,550 bushels were delivered to Debtor. Records do not indicate any further deliveries or payments made. Therefore, for this delivery, the Wurms' claim seeks $29,014.89 in unpaid principal. This was not a deferred sale and the Wurms did not charge Debtor interest. Thus, the Trustee concedes that the Wurms are entitled to payment on the 1993 corn in the amount of $29,014.89.

11. The Wurms assert that none of the 1993 crop was delivered on a deferred pricing basis. Instead, they insist that, after Roy Wurm's death, they sold the 1993 crop on a cash basis since they needed the money to plant the spring crop. The initial determination of the Department of Agriculture was that the 1993 crop was not part of any investment program, but rather was for an immediate cash sale which Debtor simply did not pay and which would be recovered under the Debtor's bond.

12. In 1992 the Wurms also produced corn and soybeans which they delivered to Debtor in the fall of 1992. According to settlement sheets introduced into the record, Debtor agreed to pay for the corn and soybeans in January and April, 1993, respectively, at a premium over the original price. On January 15, 1993, Debtor paid the Wurms $48,116.81 for the corn which included a premium of 5.5 cents per bushel ($1,591.78 in interest). On April 15, 1993, Debtor paid the Wurms $51,174.96 for the soybeans. The original price for the 1992 soybeans was $6.06 but they were premium priced on April 15, 1993 at $6.36 ($2,476.71 in interest). This contract was a futures contract, but because it was paid it is not listed in the Wurms's claim. Debtor paid interest on this sale in the total amount of $4,068.49.

13. The contracts were only a part of the overall business dealings between the Wurms and Debtor. The Wurms sold other crops to Debtor for which they were paid cash.

14. In 1993 Debtor issued the Wurms personal checks or issued checks to their

creditors on their behalf. These disbursements were as follows:

| Check No. | Date | Amount | Payable to: |
|---|---|---|---|
| 40498 | 04/15/93 | $2,054.17 | Todd Wurm |
| 40499 | 04/15/93 | $2,054.17 | Mark Wurm |
| 40519 | 04/20/93 | $9,680.00 | Mies Equip. |
| 40520 | 04/20/93 | $25,650.00 | Cokota Imp. Co. |
| 40521 | 04/20/93 | $4,021.70 | Litchfield Imp. |
| 40522 | 04/20/93 | $4,328.30 | Todd Wurm |
| 40584 | 06/07/93 | $69,320.00 | Mies Equip. |
| 40957 | 08/30/93 | $693.20 | Mark Wurm |
| **TOTAL** | | **$117,801.54** | |

The checks paid to Mies Equipment, Cokota Implement, and Litchfield Implement were for bills owed by the Wurms to their suppliers. While the Wurms do not dispute that these payments were made to them or on their behalf, they do dispute the amount. For purposes of the motion for summary judgment, the Trustee concedes the amount of these payments to be $113,000.

15. In total, Debtor paid an undisputed $117,068.49 ($113,000 + $4,068.49) to the Wurms on all the contracts set forth above. Of this amount, $4,068.49 represents the interest paid on the 1992 soybean and corn contract (as set forth in Paragraph 12) and the agreed upon $113,000 represents the amount paid to the Wurms and their creditors in 1993. The Wurms applied the $113,000 as payments against the 1988 corn contract. The Wurms concede that of this $113,000, $72,638.93 represented accumulated interest and the remainder was applied to principal.

16. In the fall of 1993, the Wurms prepaid a fuel expense for the Debtor in the amount of $6,983.82 for which they have not been paid. The Trustee agrees this amount is owing the Wurms.

17. The usury rate under Minn.Stat. § 334.011 at the relevant periods of time was as follows:

| From | To | Fed. Disc. Rate | Usury Int. Rate |
|---|---|---|---|
| 05/20/85 ... | 03/06/86 | 7.5% | 12.0% |
| 03/07/86 ... | 04/20/86 | 7.0% | 11.5% |
| 04/21/86 ... | 07/10/86 | 6.5% | 11.0% |
| 07/11/86 ... | 08/20/86 | 6.0% | 10.5% |
| 08/21/86 ... | 09/07/87 | 5.5% | 10.0% |
| 09/08/87 ... | 08/08/88 | 6.0% | 10.5% |
| 08/09/88 ... | 02/23/89 | 6.5% | 11.0% |
| 02/24/89 ... | 12/18/90 | 7.0% | 11.5% |
| 12/19/90 ... | 01/31/91 | 6.5% | 11.0% |
| 02/01/91 ... | 04/29/91 | 6.0% | 10.5% |
| 04/30/91 ... | 09/12/91 | 5.5% | 10.0% |
| 09/13/91 ... | 11/05/91 | 5.0% | 9.5% |
| 11/06/91 ... | 12/22/91 | 4.5% | 9.0% |
| 12/23/91 ... | 07/01/92 | 3.5% | 8.0% |
| 07/02/92 ... | 05/16/94 | 3.0% | 7.5% |

18. On August 10, 1994, the Trustee filed a Complaint challenging the validity of the Wurms' claim. Count I alleges that the contracts were contracts for the forbearance of money at usurious rates of interest in violation of Minn.Stat. § 334.011. He seeks disallowance of the Wurms' claim pursuant to Minn.Stat. § 334.05 (except to the extent of the $6,983.82 fuel prepayment (Paragraph 16) and the $29,014.89 sought for the 1993 corn crop (Paragraph 11(j)(3))). The Trustee also seeks pursuant to § 334.011(2) return of double the amount of interest Debtor paid to the Wurms in the amount of $153,414.84 (($72,638.93 + $4,068.49) × 2). Count II asserts that the Wurms' claim is barred by the statute of limitations. Counts III and IV seek equitable subordination of the Wurms' claim under §§ 509 and 510 of the Bankruptcy Code.

19. In their Amended Answer, supported by their deposition testimony, the Wurms allege that it was their understanding that Debtor was merely a broker who sold the Wurms' grain to Pillsbury or Peavey on the understanding that those companies would pay premium prices for their crops if the Wurms agreed to take a deferred payment. They have testified that Debtor told them Pillsbury or Peavey had placed the proceeds from the sales in segregated accounts with those companies. Further, the Wurms have testified that Debtor represented that the companies had agreed to pay an escalating premium the longer the Wurms allowed these companies to hold the proceeds for them and they relied on this representation when they delivered the crops without requiring immediate cash payment. Based on these allegations, the Wurms assert that there was no agreement between them and the Debtor, but rather the agreement was with corporations (Peavey and Pillsbury), and therefore the contracts are not usurious. In addition, the Wurms argue that, even if the contracts are usurious, they are excepted from the usury law under Minn.Stat. § 334.011 since they exceed $100,000. They also raise three affirmative defenses. *First*, the Trustee's usury claim is barred by a two-

year statute of limitations. *Second*, Debtor defrauded them and thus the Trustee is equitably estopped from making the usury claims. *Third*, the Wurms are entitled to set off their claim to the extent it is not barred by Minn.Stat. §§ 334.011 and 334.05 against the Trustee's claim for $153,414.84.

20. The Trustee has moved for summary judgment on Count I of the Complaint seeking forfeiture of the Wurms' claim (except as specified previously) and a return of double the amount of interest paid to them. The motion does not relate to Counts II or Count III.

21. In 1994, the Wurms sued Debtors under § 523 seeking to have Debtors' debt to them determined to be nondischargeable based on fraud. The case was settled. The settlement amount, if any, has not become part of this record.

## CONCLUSIONS OF LAW

### A. *Standards for Summary Judgement*

■ Summary judgment is governed by Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Bankruptcy Rule 7056. Federal Rule 56 provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party on summary judgment bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party is the plaintiff, it carries the additional burden of presenting evidence that establishes all elements of the claim. *United Mortgage Corp. v. Mathern (In re Mathern)*, 137 B.R. 311, 314 (Bankr. D.Minn.1992), *aff'd*, 141 B.R. 667 (D.Minn. 1992). The burden then shifts to the nonmoving party to produce evidence that would support a finding in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). This responsive evidence must be probative, and must "do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

■ In weighing the evidence, the court may address whether the respondent's theory on the facts is "implausible." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir.1989). The court may also gauge the reasonableness of competing inferences asserted on the same basic evidence. *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 681 (9th Cir.1985); *Mathern*, 137 B.R. at 322. The reasonableness of asserted inferences is measured against the viability of the legal theory which they are asserted to support, and is also controlled by the weight and probity of the evidence advanced to support them. *Mathern*, 137 B.R. at 322–23. The ultimate question is whether reasonable minds could differ as to the factual interpretation of the evidence of record. *Id.* at 323 (citing *Liberty Lobby*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12). Thus, in some instances, a court may rely on inferences to grant a motion for summary judgment, even where subjective intent is an issue. *Id.* at 322.

### B. *Legal Issues to be Decided*

In ruling on the Trustee's motion for summary judgment, I will address whether a genuine issue of material fact exists with regard to the following issues:

1. Are the contracts usurious?

2. If so, do the contracts exceed $100,000, thereby excepting them from the usury law?

3. If the contracts are usurious and not excepted by reason of the $100,000 limitation, what are the damages?

4. Is the Trustee's claim barred by a two-year statute of limitations?

5. Is the Trustee equitably estopped from asserting the usury claim in this case?

6. Are the Wurms entitled to set off the remaining portion of their claim, if any, against the Trustee's claim?

### 1. *Are the Contracts Usurious?*

■ Usury is defined as the "taking or receiving of more interest or profit on a loan than the law allows." *Rathbun v. W.T. Grant Co.*, 300 Minn. 223, 229, 219 N.W.2d 641, 646 (1974). Chapter 334 of the Minnesota Statutes governs usury. Section 334.011 provides that in the case of a contract for the forbearance of money in an amount less than $100,000 made for business or agricultural purposes [4] the interest rate may not exceed 4.50% in excess of the discount rate on 90 day commercial paper in effect at the Federal Reserve Bank in the Federal Reserve District encompassing Minnesota. Minn. Stat. § 334.011, subd. 1. This section provides an exception to the 8 percent usury rate applicable to contracts in general. *See* Minn.Stat. § 334.01. Corporations such as Peavey or Pillsbury may not assert a usury defense. Minn.Stat. § 334.021.

■ The party asserting usury must prove four elements to establish a violation of the usury law:

1. A loan of money or forbearance of debt;

2. An agreement between the parties that the principal shall be repayable absolutely;

3. The exaction of a greater amount of interest or profit than is allowed by law; and

4. The presence of an intent to invade the law at the inception of the transaction.

*Dietz v. Phipps (In re Sunde)*, 149 B.R. 552, 555 (Bankr.D.Minn.1992); *Miller v. Colortyme, Inc.*, 518 N.W.2d 544, 548 (Minn.1994); *Trapp v. Hancuh*, 530 N.W.2d 879, 885 (Minn.Ct.App.1995). If any element is absent, the transaction is not usurious. *Trapp*, 530 N.W.2d at 885. Because usury laws are penal in nature, they should be construed with reasonable strictness. *Seebold v. Eustermann*, 216 Minn. 566, 574, 13 N.W.2d 739, 744 (1944); *Widmark v. Northrup King Co.*, 530 N.W.2d 588, 590–91 (Minn.Ct.App.1995).

#### a. *Forbearance on Debt*

The first issue is whether the transactions between Debtor and the Wurms constitute the forbearance of a debt.[5] The Wurms insist that they never agreed to forbear in collecting a debt *from Debtor* since the Wurms never sold grain to Debtor in the first place. According to them, Debtor was only a broker in the transaction. Instead, they assert that any potential forbearance would be between the Wurms and the commodity companies, which could not assert a usury defense.

In addressing this issue, a court must look through the form and the words of the agreement to its substance. *Colortyme*, 518 N.W.2d at 549. The Minnesota Supreme Court has defined the term "forbearance" as follows: "In usury law, the term signifies [the] contractual obligation of a lender or creditor to refrain, during a given period of time, from requiring the borrower or debtor to pay a loan or debt then due and payable." *Rathbun*, 219 N.W.2d at 648 (citations omitted); *see Colortyme*, 518 N.W.2d at 549 (citing *Rathbun*); *St. Paul Bank for Cooperatives v. Ohman*, 402 N.W.2d 235, 238 (Minn. Ct.App.1987) ("A forbearance exists where there is a present debt payable initially at the cash price or over time with an added finance charge."). In other words, forbearance permits the debtor to keep the use of his or her money.

The Minnesota Court of Appeals recently addressed whether a contract constituted a forbearance of a debt. In *Widmark v. Northrup King Co.*, the plaintiff was a dealer who sold seeds on behalf of Northrup pursuant to a dealer agreement. The agreement entitled Northrup to assess a "late charge" of

---

**4.** A "business loan" is defined as a loan for "commercial or industrial enterprise which is carried on for the purpose of an active or passive investment or profit." Minn.Stat. § 334.011, subd. 1. An "agricultural" loan is a loan for "the production, harvest, exhibition, marketing, transportation, processing, or manufacture of ag-

ricultural products...." *Id.* The parties agree that § 334.011 is the controlling law.

**5.** It is undisputed that the Wurms did not loan Debtor money.

1.5 percent per month on all late payments made from the plaintiff to Northrup. Due to the plaintiff's delinquent payments, Northrup assessed a late charge and terminated its relationship with the plaintiff, who then sued Northrup for past due commissions and alleged that the late charge was usurious. In holding that the transaction was not usurious, the court of appeals focused on Northrup's behavior. It noted:

> Northrup never actually agreed to forego an immediate action on [the plaintiff's] account if it became overdue in exchange for a late charge. Unlike typical credit arrangements, Northrup *did not encourage late payments in order to recover the additional charge;* in fact, Northrup terminated its relationship with [the plaintiff] partially because of late payment. Consequently, we hold that there was no forbearance here within the meaning of the usury laws.

*Widmark,* 530 N.W.2d at 591 (emphasis added).[6]

■ Unlike *Widmark,* the Wurms did encourage late payments so as to recover the higher interest rates (with the possible exception of the 1993 crops). Further, the Wurms never threatened to terminate the relationship based on a failure to pay for the crops. In fact, the contracts unambiguously show that the Wurms contractually agreed not to seek payment for specified periods of time, for which the *quid pro quo* was the generation of the premium. Irrespective of how the transaction was labeled, the uncontroverted facts illustrate that this agreement devised by the parties constitutes a forbearance on a debt. Someone owed the Wurms for the crops; the Wurms did not press for payment; the Wurms agreed to be paid a premium in return for not seeking immediate payment. Thus, all the contracts, with the exception of the 1993 crops, can be character-

ized as one for the forbearance of a debt within the meaning of § 334.011.

While the Trustee has met his burden on establishing a forbearance on a debt, the Wurms have met their corresponding burden with regard to the 1993 crops. In his affidavit, Mark Wurm explains that after his father died he and his brother needed money to plant the spring crop. As such, they characterize the 1993 transactions as cash—not deferred—sales. Therefore, a material issue of fact exists as to whether the sale of the 1993 crop involved a forbearance of a debt.

In addition, there is a clear factual dispute over whether the Debtor or the commodities companies were involved in these transactions. The Trustee has met his burden by introducing the affidavit of Debtor demonstrating that he believed the investment arrangement was one between the Wurms and the Debtor. The Wurms have, however, met their corresponding burden by testifying in their depositions that the debt was not owed by the Debtor but rather by the commodities company. Accordingly, there is a genuine issue of fact as to whether there was a forbearance agreement between *Debtor* and the Wurms. The first element, therefore, is not satisfied.

### b. *Principal Repayable in Full*

No material issue of fact exists regarding whether the principal was repayable absolutely. The contracts clearly provide that the Wurms are to be paid the full amount of the deposited proceeds of their crops. This unambiguous language is supported by the depositions of Todd and Mark Wurm and the affidavit of Debtor. Moreover, the Wurms filed proofs of claim both in this bankruptcy and with the Minnesota Department of Agriculture seeking the entire unpaid principal. Accordingly, the second element is met.

---

**6.** The court in *Widmark* addressed, but rejected, the possibility that the transaction was within the time-price doctrine. A time-price transaction, which is outside the scope of the usury law, occurs when the owner has the right to determine the price at which he will sell his property. One price may refer to cash, while another to credit. The difference between a time-price transaction and a deferred payment transaction, which is included in the usury law, centers on whether there is in fact a "cash" price and a "time" price which impermissibly charges an illegal rate of interest on the deferred payments. *Ohman,* 402 N.W.2d at 238. Here, the Wurms do not assert that the contracts fall under the time-price exception to usury.

### c. *Usurious Interest Rates*

The third element requires the exaction of a greater amount of interest than is allowed by law. Section 334.011 governs the allowable rates of interest in business and agricultural loans. It provides in pertinent part:

Notwithstanding the provisions of any law to the contrary a person may, in the case of a contract for the loan or forbearance of money, goods, or other things in action in an amount of less than $100,000 for business or agricultural purposes, charge interest at a rate of not more than 4½ percent in excess of the discount rate on 90 day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district encompassing Minnesota.

Minn.Stat. § 334.011, subd. 1.

While neither party disputes how to compute the allowable rate of interest for the contracts at issue, they do disagree as to the date the determination should be made. The Trustee has not calculated the applicable interest rate to April 15, 1989. But he has shown that from and after that date, all the contracts entered into to that point in time called for usurious rates of interest and he has also shown that all contracts entered into thereafter bore usurious rates of interest. The trustee contends that, whatever the situation was prior to April 15, 1989, when the parties changed the interest or premium on the contracts every year, they modified the contracts. As such, the Trustee insists that the relevant interest rate is the rate on the date the contracts were last amended on April 15, 1993. As of that date the rate was usurious.

 The general rule is that a contract must charge unlawful interest at its inception to violate the usury law. That is, a contract that is valid when made cannot then become void for usury because it subsequently develops that the lender will receive a greater return for the use of the money than the highest lawful rate. Minn.Stat. § 334.011, subd. 3 ("If the rate of interest charged is permitted by this section at the time the loan was made, the rate of interest does not later become usurious because of a fluctuation in the federal discount rate."); *see also Andrews v. Andrews*, 170 Minn. 175, 181, 212 N.W. 408, 410 (1927). If a contract has been subsequently modified or amended, however, the relevant date for purposes of determining the lawful interest rate is the date of the last amendment. *Citizen's Nat'l Bank v. Taylor*, 368 N.W.2d 913, 918 (Minn. 1985). In *Taylor*, the lender altered three notes by crossing out the interest rate and writing in its place on the face of each note an interest rate that was usurious. The trial court found that the borrower had consented to the alteration of the notes and the consent established a contract to pay usurious interest on the debt. On appeal, the Minnesota Supreme Court agreed, stating:

Generally, an alteration that is consented to may be enforced against the consenting party. Once an alteration is consented to, a holder should not have the option of enforcing either the original agreement or the new agreement; the original agreement has, in essence, ceased and been replaced by the new one.... Once [the borrower] consented to the alteration, the bank could only enforce the notes as altered. The bank could not go back and enforce the notes according to their original tenor, and specifically could not use this device to escape from the penalty for violating the usury laws by pretending the usurious agreement somehow did not exist.

*Id.* at 919–20 n. 2.

Here, it is possible that all the contracts bore a usurious interest rate from their inception but that need not be calculated for purposes of ruling on this motion. The Wurms and Debtor modified the contracts when they adjusted the premium to reflect a different and ever increasing rate of return. There is no factual dispute that from April 15, 1989 each contract, with the possible exception of the 1992 corn and soybean contract (Paragraph 12), was amended to bear a usurious rate and that all contracts written after that date bore an interest rate in excess of the rate allowed by § 334.011. Reasonable minds could not differ as to this interpretation. Accordingly, because no material issue of fact exists, all the contracts written prior to April 15, 1989, as amended, and those entered into after April 15, 1989 ex-

ceeded the allowed interest rate. Thus, the third element is met.

Reasonable minds can differ, however, as to whether the 1992 corn and soybean transaction (as set forth in paragraph 12) charged a usurious rate since the Trustee has submitted relatively little evidence into the record on this contract. While the parties apparently agree that Debtor paid $4,068.49 in interest for these crops, there is not evidence sufficient to establish that this exceeded the lawful amount of interest. With regard to the 1992 corn and soybean transaction, a material issue of fact exists as to whether it bore the usurious interest rate.

### d. *Intent to Violate The Law*

The final issue is whether the Wurms harbored the requisite intent to violate the usury law. The Minnesota Supreme Court has recently stated, "To be guilty of violating the usury law, a lender need only intend to charge a rate that is in fact usurious. It matters not whether the lender knows he is violating the usury law." *Colortyme*, 518 N.W.2d at 550 (citing *Citizens Nat'l Bank v. Taylor*, 368 N.W.2d at 919). Thus, if a lender intentionally charges an interest rate that is in fact usurious, it is presumed that he intends the natural consequence of his act—a usury violation. *Taylor*, 368 N.W.2d at 919.

A limited exception to this rule does exist when the precautions taken by the lender indicate a purpose to act in good faith. *Wetsel v. Guaranteed Mortgage Co.*, 195 Minn. 509, 512, 263 N.W. 605, 606 (1935). In other words, to qualify for this exception, the lender "must have affirmatively demonstrated good faith by taking a 'precautionary action' *before entering into the transaction.*" *Sunde*, 149 B.R. at 556. One such action is talking to a qualified third party for review of the transaction's propriety. *Id.*

Here, the Trustee has met his initial burden of establishing that the Wurms acted with the requisite intent. The Wurms entered into the amended contracts with the intent to charge the stated interest, whether that charge be to Debtor or to corporations such as Pillsbury or Peavey. This uncontroverted fact is demonstrated on the face of the

contracts, including the handwritten signature of Roy Wurm approving the amendments. The Wurms have, however, met their burden by coming forward with evidence suggesting a lack of intent. According to them, they were not making a contract with an individual, but with corporate lenders. That evidence, if believed, could demonstrate that they never had any intention of charging Debtor *any* interest and that they acted in good faith. As a result, the fourth element is not met.

In sum, the Trustee has not established that the contracts entered into by Debtor and the Wurms were usurious. With respect to all contracts, the Trustee has failed to show the lack of a genuine material fact with respect to: (1) whether the agreements between the Debtor and the Wurms for the 1993 crops were agreements to forbear on a debt as opposed to cash sales; (2) whether all the contracts constituted a forbearance of a debt with the *Debtor* ; (3) whether the 1992 corn and soybean contract bore an unlawful interest rate; and (4) whether the Wurms acted with the requisite intent on all contracts.

Accordingly, since genuine issues of material fact exist, summary judgment in favor of the plaintiff is not appropriate on this issue.

### 2. *Do the Contracts Exceed $100,000?*

Section 334.011 expressly states that the usury laws shall not apply to any contract for a loan or forbearance of money that exceeds $100,000. Minn.Stat. § 334.011, subd. 1.; *Negaard v. Miller Constr. Co.*, 396 N.W.2d 833, 836 (Minn.Ct.App.1986). The Wurms argue that, even if the contracts are usurious, they exceed $100,000 and are thus exempt. The Wurms argument is threefold. *First,* they contend that *all* the contracts comprise one contract, as opposed to a series of contracts. *Second,* even if the contracts are separate and distinct, they argue the 1986 corn contact exceeds $100,000. *Third,* they insist that the 1989 soybean contracts were in reality one contract, thereby exceeding the $100,000 limit. I will address these contentions separately.

### a. *One contract or a series of contracts*

The Wurms first attempt to characterize all the contracts as one contract. In support, they rely on *Negaard v. Miller Construction Co.* for the proposition that the usury exception applies where a series of advances exceeds $100,000. In *Negaard*, the defendant contracted to build a house for the plaintiff. Pursuant to the contract, the defendant sent plaintiff monthly billings, due 30 days from the billing date with interest at 12 percent. The plaintiff later missed some monthly payments and the amount due escalated to $86,000. Worried that it would not get paid, the defendant required plaintiff to sign a promissory note in the amount of $150,000—the estimated remaining amount due. The balance under the construction contract then exceeded $200,000 and the defendant, for the first time, calculated usurious interest on the overdue amount. Later, the plaintiff made payments retiring all interest on the debt and reduced the balance to $75,000, for which he signed a new note on which he later defaulted. *Negaard*, 396 N.W.2d at 834–35. The court aggregated the note and the balances as one and held that, since plaintiff first began paying interest when the balance was near $200,000, the transaction was excepted from the usury law. *Id.* at 836.

 *Negaard* is distinguishable from this case. In *Negaard*, the different balances and notes arose out of one contract to build a house and the only change in the contract was the terms of payment. Thus, aggregation of the balances made sense. Here, the Wurms sold crops to Debtor in different years for varying amounts under separate contracts. The undisputed facts illustrate that, when Debtor and the Wurms entered into the contracts, they envisioned separate and distinct contracts. Both the claim filed in Debtor's bankruptcy and the claim filed with the Minnesota Department of Agriculture treat the contracts as separate for each year. More significant, however, is that the Wurms applied any payment by the Debtor to one particular contract; they did not spread the payment across all the contracts. The Wurms have submitted no evidence to show otherwise. Accordingly, all the contracts represented a series of individual contracts which may not be aggregated for purposes of exceeding the $100,000 limit.

### b. *1986 corn contract*

 The Wurms next argue that the 1986 corn contract exceeds $100,000. The total due on this contract equals $119,088.99; $50,875 represents the unpaid principal and $68,213.99 represents the unpaid premium. The Trustee insists that the only reason the contract exceeds $100,000 is because of the impermissible and repeated compounding of usurious interest. The precise language of § 334.011 states that usury applies to "a contract for the ... forbearance of money ... in an amount less than $100,000." The most reasonable interpretation of this language is that the $100,000 limit is to be applied to the principal only at the inception of the contract. *See Negaard*, 396 N.W.2d at 836 ("the interest was actually charged at a time when the debt far exceeded $100,000.").

This result makes sense. It would be illogical for a contract with a principal balance of less than $100,000 to later became excepted from the usury laws because the lender charges usurious interest and then compounds that usurious interest to increase the amount owing and exceed the $100,000 limit. In other words, a usurious loan cannot be self-correcting simply because it continues to accumulate vast amounts of unlawful interest. Not until April of 1993 did the 1986 corn contract exceed a balance of $100,000. At that point, it was clear it had accumulated a significant amount of compounded usurious interest. Absent the impermissible interest, the contract is not in excess of the $100,000 limitation. Therefore, this usurious contract is not excepted from the provisions of § 334.011.

### c. *1989 contracts*

The Wurms finally assert that the 1989 soybean contracts comprised one contract for soybeans for the year of 1989. The combined principal and interest owed on the two contracts exceeds $100,000. However, the combined amount of original principal does not. For the reason stated immediately above, it is not necessary to decide whether the 1989 contracts are separate or combined. In combination, the principal does not exceed

$100,000 and the exception for contracts in excess of $100,000 set forth in § 334.011 does not apply.

Since none of the contracts exceed $100,-000, the Trustee is entitled to summary judgment on this issue.

### 3. *Damages*

▮ If the trustee establishes that the contracts exact a usurious amount of interest and violate § 334.011, he will be entitled to two basic forms of relief: a return of double the amount of interest paid; and forfeiture of any claim for return of principal and accrued interest. Section 334.011(2) provides:

If a greater rate of interest than that permitted by subdivision 1 is charged then the entire interest due on that note, bill or other evidence of debt is forfeited. If the greater rate of interest has been paid, the person who paid it may recover in a civil action an amount equal to twice the amount of interest paid.

Minn.Stat. § 334.011, subd. 2. In addition, § 334.03 states in pertinent part:

All bonds, bills, notes, mortgages, and all other contracts and securities, and all deposits of goods, or any other thing, whereupon or whereby there shall be reserved, secured, or taken any greater sum or value for the loan or forbearance of any money ... shall be void except as to a holder in due course.

Minn.Stat. § 334.03. The remedies outlined in §§ 334.011 and 334.03 are cumulative, not exclusive.[7] *Sunde,* 149 B.R. at 560.

Thus, any contract that the Trustee establishes is usurious will be *void* under § 334.03, and the Wurms' claim will be forfeited to the extent it seeks repayment of the principal and interest on usurious contracts. This

could result in a forfeiture of the entire claim (if *all* the contracts are usurious) with the exception of $29,014.89 due under the 1993 corn contract and the $6,983.83 due for reimbursement of fuel, which the Trustee concedes is owed, except to the extent the Wurms have received sums from Debtor in their dischargeability case or their Department of Agriculture claim. In addition, the Trustee will be entitled to double the amount of interest that Debtor has actually paid on the usurious contracts pursuant to § 334.011(2). At a maximum, this recovery will be $153,414.84. Specifically, the Trustee may be entitled to $145,277.86 ($72,638.93 × 2) under the 1988 corn contract, and $8,136.98 ($4,068.49 × 2) under the 1992 corn and soybean contract. To recover, however, the Trustee must establish forbearance on a debt with Debtor and intent with respect to both contracts. In addition, the Trustee must establish that the 1992 corn and soybean contract bore an unlawful rate of interest.

### 4. *Statute of Limitations*

The Wurms assert, however, that the Trustee's claim for forfeiture of principal and accrued interest and for recovery of double the amount of interest paid is barred by a two-year statute of limitations. Specially, the Wurms contend that Minn.Stat. § 541.07(2)-a two-year statute of limitations—began to run the date the contracts were originally entered into and therefore, any action on all but the 1992 and 1993 contracts is time-barred.[8] In response, the Trustee argues it is irrelevant what the applicable statute is since any limitations period would begin running on the date the parties last amended the contracts—which would be

---

**7.** The Wurms do not argue that the remedy provided in § 334.011 is the exclusive remedy, and thus I need not decide the issue. It is interesting to note, however, that a conflict exists among the courts. *Compare Sunde,* 149 B.R. at 560 (stating that § 334.03 "clearly affords a general remedy for the chapter, to which § 334.011 subd. 2 is cumulative for a specific sort of violation.") *with Trapp v. Hancuh,* 530 N.W.2d 879, 886 (Minn.Ct. App.1995) (holding that the lender borrower remains obligated to repay the principal portion of the debt); *St. Paul Bank for Cooperatives v. Oh-*

*man,* 402 N.W.2d 235, 239 (Minn.Ct.App.1987) (noting that, under § 334.011, subd. 2, the borrower remains liable for the principal amount of the debt.).

**8.** Actually, the Wurms argue that the claims on all the contracts are time barred since all the contracts comprise one contract sating from 1985. Because I concluded in Part 2.a of this opinion that the contracts were separate, I adapt the Wurms argument here.

either in April, 1993 or in the case of the 1992 corn contract, October 1993.

This raises two issues: (1) what is the applicable statute of limitations for actions for return of double the interest paid arising under § 334.011(2) and when does it begin to run?; and (2) what is the applicable statute of limitations for actions for forfeiture of principal and accrued interest under § 334.011(2) and § 334.03 and when does it begin to run? No Minnesota reported decision has addressed these questions.

1. *Applicable Statute of Limitations: Recovery of Interest Paid under § 334.011(2)*

Section 541.07(2) states that any action "upon a statute for a penalty or forfeiture" shall be commenced within two years. Minn. Stat. § 541.07, subd. 2 (1995). There is no dispute that usury laws are penal in nature. *See United Realty Trust v. Property Dev. & Research Co.,* 269 N.W.2d 737, 743 (Minn. 1978). In addition, § 334.02 of the usury law, which was not cited by either party, states in part:

> Every person who for any such loan or forbearance shall have paid or delivered any greater sum or value than in *section 334.01* allowed to be received may, personally or through personal representatives, recover ... the full amount of interest or premium so paid, with costs, if action is brought *within two years after such payment or delivery.*

Minn.Stat. § 334.02 (emphasis added). While § 334.02 may or may not be applicable to actions arising under § 334.011(2), it suggests, as does § 541.07(2), that, under whatever statute, the limitations period is two years for actions to recover usurious interest that has been paid.

■ Because the limitations period is two years, I next must decide when the period starts running on actions to recover usurious interest. Contrary to either the Trustee's or the Wurms' assertions, the limitations period begins running upon payment of the usurious interest. This result is supported by the language of § 334.02 (if not applicable then surely persuasive). *See also Negaard,* 396 N.W.2d at 836 (holding that, under § 334.02, "any action to recover usurious interest must be brought within two years of its payment."). This comports with the general rule adopted around the country. *See Cook v. Lillo,* 103 U.S. 792, 793, 26 L.Ed. 460 (1880) (interpreting Louisiana law); 45 Am. Jur.2d, *Interest & Usury* § 280 (1969) ("The right of action accrues at the time of the actual payment of the usury, and not at the time it was agreed to be paid").

■ The Trustee seeks to recover double the interest Debtor paid on the 1988 corn contract and the 1992 corn and soybean contract. These payments were all made in 1993. The Trustee commenced this action in 1994. The limitations period on recovery of interest paid by Debtor has not run.

2. *Applicable Statute of Limitations: Forfeiture of Principal and Accrued Interest under §§ 334.011(2) and 334.03*

■ I must next determine the applicable limitations period for the forfeiture of the principal and interest. Neither party has adequately briefed this issue. Section 334.03 provides that all usurious contracts "shall be void except as to a holder in due course." Minn.Stat. § 334.03; *Wolpert v. Foster,* 312 Minn. 526, 533, 254 N.W.2d 348, 352–53 (1977); *Phalen Park State Bank v. Reeves,* 312 Minn. 194, 200, 251 N.W.2d 135, 139 (1977). A void contract is no contract at all; it binds no one and is a mere nullity. Thus, an action cannot be maintained on the contract, nor can the contract later be validated.[9] *Spartz v. Rimnac,* 296 Minn. 390, 394, 208 N.W.2d 764, 767 (1973); Restatement (Second) of Contracts § 7 comment a (1981); 17A Am.Jur.2d, *Contracts* § 7 (1991). Since a void contract is a nullity, it reasons that no limitations period could apply. Stated differently, if the contracts in this case are deemed usurious, they in essence never existed and

---

**9.** A voidable contract, on the other hand, is "one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance." Restatement (Second) of Contracts § 7 (1981).

the Wurms cannot raise a statute of limitations defense. *See Pacchiana v. Pacchiana,* 94 A.D.2d 721, 462 N.Y.S.2d 256, 258 (N.Y.App.Div.1983) (stating that a void antenuptial agreement was of no effect at its inception and thus the statute of limitations was not a defense). Conversely, if the contracts are not usurious, they are not void but are enforceable. The Wurms could maintain any action on the contracts, subject to any applicable statute of limitations.

In sum, neither the Trustee's claim to recover double the amount of interest paid or his claim seeking forfeiture of the Wurms' claim is barred by a statute of limitations. The Trustee is entitled to summary judgment on this issue.

### 5. *Equitable Estoppel*

The next issue is whether the Wurms may equitably estop the Trustee from asserting usury either as a defense against the allowance of the Wurms' claim or affirmatively to recover payments made by the Wurms to the Debtor.[10] The Wurms allege that Debtor misrepresented to them that Debtor was selling their grain to Peavey and Pillsbury and the proceeds of those sales would be held in an account with those companies at a premium for the Wurms benefit. The Debtor has denied this and has filed an affidavit in which he says he did not know the rate he was charging was usurious, had no intent to lure the Wurms into a usurious contract for the purpose of later claiming usury, and did not consult with counsel prior to making the contracts.

■ A party seeking to estop another party from asserting claims or defenses must prove three elements:

1. that promises or inducements were made;
2. that the party invoking the doctrine reasonably relied upon the promises; and
3. that the invoking party will be harmed if estoppel is not applied.

*Sunde,* 149 B.R. at 557; *Resolution Trust Corp. v. Johnson (In re Johnson),* 139 B.R. 208, 218 (Bankr.D.Minn.1992); *Hydra–Mac, Inc. v. Onan Corp.,* 450 N.W.2d 913, 919 (Minn.1990).

■ Courts generally agree that, while the equitable defense of estoppel is not ordinarily available to a claim of usury, a borrower may be estopped by conduct or representations from claiming or using as a defense usury if all elements to equitable estoppel are met. In other words, the borrower's initiation of, or fraud contributing to, a usurious transaction should estop the borrower from claiming usury. *See In re Sunde,* 149 B.R. at 558 (noting that a borrower may be estopped from asserting usury violations if the borrower knew of the violation before undertaking the transaction, and used that knowledge to take advantage of the lender); *Nelson v. Dorr,* 239 Minn. 423, 433, 58 N.W.2d 876, 882 (1953); *Gilbert v. Otterson,* 379 Pa.Super. 481, 550 A.2d 550, 553 (1988) ("A borrower who initiates an excessive interest rate and induces an uninformed lender to accept a rate higher than that permitted by statute will not be permitted to benefit by his own wrong by recovering treble damages."); *Arguelles v. Kaplan,* 736 S.W.2d 782, 785 (Tex.Ct.App.1987) (noting that "a party may not claim usury when he has participated in the deception of the lender."); *Miro v. Allied Fin. Co.,* 650 S.W.2d 938, 944 (Tex.Ct.App.1983) ("a borrower cannot assert a subterfuge of its own making to establish usury without proof that the lender participated in or had actual knowledge of the subterfuge."); 45 Am.Jur.2d, *Interest and Usury* § 257 (1969).

Less clear, however, is whether a borrower should be estopped from claiming usury where the lender does not necessarily misrepresent the transaction as it relates to the usurious rates, but makes misrepresentations to the transaction as a whole. Phrased differently, may a borrower be estopped from claiming usury where neither party, including the borrower, had knowledge the rates were usurious but the borrower engaged in

---

**10.** The trustee stands in the debtor's shoes with respect to the usury claim. Thus, any defenses good against the debtor are good against the trustee. 11 U.S.C. § 541(a)(1); *Sunde,* 149 B.R. at 556 & n. 4.

misrepresentations concerning the deal in its entirety.

In *In re Sunde*, the defendants, who did not know the legal limits on interest, argued that the Trustee should be estopped from asserting his usury claim since the debtors instigated the usurious transaction, took the initiative on the interest rate issue, and structured the terms of the loan. The debtors, however, were as innocent as the defendants with respect to the knowledge of the legal ceiling on the rate of interest. *Sunde*, 149 B.R. at 558. In holding that equitable estoppel was not applicable, Judge Kishel reasoned:

> In its essence, equitable estoppel prevents a party from "having it both ways." If a party has knowingly and intentionally committed itself to a position which was not in its own best interest, legally or factually, it may not later insist upon a strict legal enforcement of the rights which it would have had in the absence of the commitment. Inherent in the defense, however, is a requirement of scienter: the party to be estopped must have been aware of its rights under law, and proceeded, intentionally and with that knowledge, to forgo those rights.

> In an application of equitable estoppel to a usury claim, the *material* representation necessarily goes the legal propriety of the interest rate. The willingness of the borrowers to pay the interest to be exacted does not go to any of the four elements of actionable usury: it simply is not material.

*Id.* at 558 (citations omitted). Because in *Sunde* the borrower did not make a representation regarding the interest rate, the defense was not available. *Accord Liebergesell v. Evans*, 93 Wash.2d 881, 889, 613 P.2d 1170 (1980) ("the question of whether an estoppel may be asserted depends on the plaintiff's right to rely on defendants' representations, either explicit or implied through their failure to speak, regarding the validity of the loan.").

■ Here, like *Sunde*, the Wurms do not allege that Debtor engaged in any misrepresentations concerning the interest rates. Unlike *Sunde*, however, the Wurms allege that Debtor misrepresented the entire nature of the transaction. Mark Wurm sets forth in his deposition that the Wurms never entered into a sale contract with Debtor, but instead believed Debtor was merely a broker between the Wurms and Peavey or Pillsbury. Assuming as true the Wurms allegation that Debtor told them the proceeds of the sale were held in an account with a grain companies, and the Wurms relied on this representation, the Wurms may never have entered into the contracts in the first place. It would be grossly unfair to allow the Debtor to hide behind the shield of the usury laws to recover on contracts that were initially misrepresented.

Therefore, the Wurms may assert the equitable defense of estoppel against the Trustee's claim of usury. However, a material issue of fact exists as to whether all elements of equitable estoppel are met. Accordingly, the Trustee is not entitled to summary judgment on this issue.

### 6. *Setoff*

Finally, the Wurms insist that are entitled to set off their allowed claim, if any, against any recovery on the Trustee's usury claim. The Trustee disagrees for the same reasons he contested the application of equitable estoppel. He contends that equitable defenses have no place against usury claims. For the same reasons I allow the equitable defense in the previous discussion, I conclude that the Wurms are not prohibited from asserting the defense of setoff if this defense is warranted in this situation.

#### 1. *Setoff Standards*

Section 553 of the Code governs setoff. It provides, in part:

> (a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case except to the extent that—

(1) the claim of such creditor against the debtor is disallowed;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case. . . .

11 U.S.C. § 553(a).

■ The language of § 553 does not create a right of setoff where none exists. Rather, it recognizes the existence of the doctrine under applicable nonbankruptcy law, and provides for further restrictions. Therefore, prior to considering setoff under § 553, the parties must be entitled to setoff under applicable nonbankruptcy law.[11] *Alexander & Jones v. Sovran Bank (In re Nat Warren Contracting Co.)*, 905 F.2d 716, 718–19 (4th Cir.1990); *Lopez Stubbe v. Rua (In re Colonial Mortgage Bankers Corp.)*, 128 B.R. 21, 24 (D. Puerto Rico 1991), *aff'd*, 971 F.2d 744 (1st Cir.1992); *United States v. Maxwell (In re Pyramid Indus., Inc.)*, 170 B.R. 974, 981 (Bankr.N.D.Ill.1994); *Karnes v. Rakers Elevator, Inc. (In re Woker)*, 120 B.R. 454, 458–59 (Bankr.S.D.Ill.1990); 4 Lawrence P. King, *Collier on Bankruptcy*, ¶ 553.02, at 553–10 (15th ed. 1994); 1 David G. Epstein et al., *Bankruptcy*, § 6–40, at 666–68 (1992).

■ If setoff is available under nonbankruptcy law, the next inquiry is whether setoff is available under § 553 of the Code, which requires that: (1) the creditor owes a debt to the debtor arising prepetition; (2) the creditor has a claim against the debtor arising prepetition; and (3) both the debt and the claim are mutual obligations. 11 U.S.C. § 553(a); *United States v. Gerth*, 991 F.2d 1428, 1431 (8th Cir.1993).

■ "For setoff purposes, a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the petition was filed." *Gerth*, 991 F.2d at 1433 (citing *Braniff Airways, Inc. v. Exxon Co. U.S.A.*, 814 F.2d 1030, 1036 (5th Cir. 1987)). For the obligation to pay to arise

prepetition, the debt must be absolutely owed prepetition. *Id.* Dependency on a postpetition event, however, does not prevent a debt from arising prepetition. *Id.; Greseth v. Federal Land Bank (In re Greseth)*, 78 B.R. 936, 941–42 (D.Minn.1987); *Moratzka v. United States (In re Matthieson)*, 63 B.R. 56, 59 (D.Minn.1986); *In re Affiliated Food Stores, Inc.*, 123 B.R. 747, 748 (Bankr. N.D.Tex.1991). "The key is whether the genesis of each debt was prepetition, that is, whether the events giving rise to the debt occurred before bankruptcy." Epstein, § 6–40, at 671 (citing *Braniff Airways*, 814 F.2d at 1036).

■ Mutuality requires that something be "owed" by both sides. To be mutual, the court must find that: (1) the debts are in the same right; (2) the debts are between the same parties; and (3) the parties stand in the same capacity. *Kitaeff v. Vappi & Co. (In re Bay State York Co.)*, 140 B.R. 608, 614 (Bankr.D.Mass.1992); 4 King, ¶ 553.04[2], at 553.22. The mutuality requirement does not mean that the debts must be of the same character or have arisen from the same transaction. 4 Collier on Bankruptcy, ¶ 553.04[1] at 553–20. The mutuality requirement is strictly construed. *Wooten v. Vicksburg Refining, Inc. (In re Hill Petroleum Co.)*, 95 B.R. 404, 411 (Bankr.W.D.La. 1988); 4 King, ¶ 553.04[1], at 553–20.

■ A creditor asserting setoff has the burden of establishing that all of the above requirements have been met. *MetCo Mining & Minerals, Inc. v. PBS Coals, Inc. (In re MetCo Mining & Minerals, Inc.)*, 171 B.R. 210, 216 (Bankr.W.D.Pa.1994). The right to setoff under § 553 is permissive, not mandatory. Therefore, its application rests within the discretion of the court and general principles of equity. *In re Bevill, Bresler & Shulman Asset Management*, 896 F.2d 54, 57 (3d Cir.1990); 4 Collier on Bankruptcy, ¶ 553.02, at 553–13. "[A] bankruptcy court may disallow an otherwise proper § 553 setoff if there are compelling reasons for not allowing such a preference." *Bird v. Carl's*

---

11. The requirements for setoff in Minnesota are virtually identical to those of § 553. *See, e.g., Firstar Eagan Bank v. Marquette Bank*, 466 N.W.2d 8, 12 (Minn.Ct.App.1991) (requiring that the existing indebtedness be due at the time of setoff and the mutuality of obligations). Due to the similarity, I will only analyze this issue under § 553.

*Grocery Co. (In re NWFX, Inc.),* 864 F.2d 593, 595 (8th Cir.1989).

### 2. Analysis

■■■ There is no dispute that both the Wurms' and the Trustee's claims arose pre-petition. In addition, mutuality exists. Both the Wurms' debt and the Trustee's debt are in the same right; the debts are between the same parties;[12] and the parties stand in the same capacity—as buyer and seller of crops.

Therefore, if, at the conclusion of trial, the contracts are deemed usurious, they are void. In that instance, the Wurms' will be owed nothing on their claim, with the exception of $35,998.71 representing the principal due on the 1993 corn crop and the fuel prepayment, adjusted for prior recoveries by them, if any. The Trustee will also be entitled to judgment in the amount no greater than $153,414.84 representing double the interest paid by Debtor on the 1988 corn contract and 1992 corn and soybean contract. In that instance, the Wurms shall be entitled to set off their claim against the Trustee's recovery.

If, however, the contracts are not usurious, the Trustee will not recover any of the interest paid and the Wurms will still have their claim. If that occurs, setoff is not an issue.

### CONCLUSION

The following summations should guide the parties at trial.

1. *Whether the contracts are usurious:* In regard to this issue, the parties will need to address the following questions at trial: (1) whether all the 1993 contracts are a forbearance on a debt, or whether, after Roy Wurms' death, Todd and Mark Wurm intended to sell these crops for cash; (2) whether all the contracts constitute a forbearance of a debt with the Debtor, as opposed to the commodity companies; (3) whether the 1992 corn and soybean contract exacts an unlawful rate of interest; and (4) whether Debtor intended to charge a usurious amount of interest.

2. *$100,000 exception not applicable:* None of the contracts exceed the $100,000 limitation. Therefore, § 334.011 is applicable to all the contracts.

3. *Damages:* If the Trustee establishes that the contracts are usurious, the Trustee will be entitled, pursuant to § 334.011(2), to double the amount of interest paid by Debtor. If the 1988 corn contract is usurious, the Trustee is entitled to $145,277.86 ($72,638.93 × 2). If the 1992 corn and soybeans contract is usurious, the Trustee is entitled to $8,136.98 ($4,068.49 × 2). In addition, the usurious contracts are deemed void under § 334.03. Thus, the Wurms' claim will be disallowed to the extent it seeks recovery of the principal and interest on the usurious contracts. Finally, the Wurms will have an undisputed minimum claim of $35,998.71 representing the principal due on the 1993 corn contract ($29,014.89) and the unpaid fuel ($6,983.82). If any of the contracts are not deemed usurious, the Wurms may also maintain their claim on those contracts—including principal and interest—to the extent not barred by a statute of limitations. The Wurms' claim will also be reduced by sums, if any, received by them from other sources.

4. *Usury claim not barred by the statutes of limitations:* Neither the Trustee's action to recover double the amount of interest paid nor his action for forfeiture of the principal and accrued interest is barred by a statute of limitations.

5. *The Wurms may assert equitable estoppel:* The Trustee may be equitably estopped from asserting the usury claim against the Wurms. At trial, the Wurms must establish all elements of equitable estoppel.

6. *The Wurms are entitled to setoff:* To the extent the Wurms and the Trustee have competing claims at the conclusion of the trial, the Wurms are entitled to assert setoff.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

---

12. As previously discussed, the Trustee stands in the shoes of the debtor. 11 U.S.C. § 541(a)(1); *Gerth,* 991 F.2d at 1435 (holding that the debtor and the debtor-in-possession are the same entities).

1. The Trustee's motion for summary judgment determining the contracts to be usurious is DENIED.

2. The Trustee's motion for summary judgment extinguishing the principal and unpaid accrued interest claimed by the Wurms in Proof of Claim No. 81 is DENIED.

3. The Trustee's motion for summary judgment in the sum of $153,414.84 is DENIED.

4. The Trustee's motion for summary judgment determining that the contracts between Debtor and the Wurms are not excepted from usury by reason of exceeding $100,-000 is GRANTED.

5. The Trustee's motion for summary judgment as to Defendant's statute of limitations defense is GRANTED.

6. The Trustee's motion for summary judgment on defendant's estoppel defense is DENIED.

7. The Trustee's motion for summary judgment on Defendant's setoff defense is DENIED.

8. The fact issues remaining for trial on Count I have been delineated in this order and shall remain for trial on August 22, 1995 at 10:00 a.m.