Delilah MILLER, et al., Petitioners, Appellants,

v.

COLORTYME, INC., et al., Respondents.

No. C2–92–2595.

Supreme Court of Minnesota.

June 24, 1994.

Petition for Clarification Denied Aug. 2, 1994.

545

Seymour J. Mansfield, Richard J. Fuller, Mansfield & Tanick, P.A., Mark N. Stageberg, Kay Nord Hunt, Lommen, Nelson, Cole & Stageberg, P.C., and David Ramp, Legal Aid Soc. of Minneapolis, Minneapolis, for appellants.

Jay M. Quam and Sue Halverson, Fredrikson & Byron, Minneapolis, for respondents.

Robert Hobbs, National Consumer Law Center, Inc., Boston, MA, William Crowder and Susan Bedor, Crowder & Bedor, St. Paul, for amicus curiae Nat. Consumer Law Center, Inc.

Elmer B. Trousdale and Christopher M. Scotti, Oppenheimer, Wolff & Donnelly, St. Paul, for amicus curiae Minnesota Retail Merchants Ass'n.

James E. Rolshouse, Minneapolis, for amicus curiae Minnesota Ass'n of Rental Dealers.

Jarvis C. Jones, Minneapolis, for amici curiae N.A.A.C.P., the Urban Coalition of Minneapolis, the Minneapolis Urban League, Matthew Little and Gleason Glover.

H. Theodore Grindal and Joseph Musliek, Opperman, Heins & Paquin, Minneapolis, for amicus curiae Ass'n of Progressive Rental Organizations.

David Woodward, St. Paul, for amicus curiae Atty. Gen., State of Minn.

## OPINION

TOMLJANOVICH, Justice.

We are asked to decide whether "rent-to-own" transactions (also known as "rental-purchase" transactions) are consumer credit sales under the Consumer Credit Sales Act, Minn.Stat. §§ 325G.15 and 325G.16 (1992), and if they are consumer credit sales, whether they are subject to the interest rate limitations of the general usury statute, Minn. Stat. § 334.01 (1992). The court of appeals held that rent-to-own agreements entered into by respondents are not consumer credit sales and are not usurious. We reverse and remand.

Respondent D.E.F. Investments, Inc. and its subsidiaries operate several rent-to-own dealerships in Minnesota. They do business under the trade name "Renter's Choice Home Furnishings." DEF uses standard form contracts to lease new and used furniture, televisions, appliances, and various other consumer goods to customers. Under these contracts, which are similar to others used in the rent-to-own industry, customers elect to rent items for a weekly or monthly rental term. At the end of each term, customers have a unilateral option to renew the agreement for another term. If a customer renews an agreement for a specified number of terms, the customer obtains title and ownership of the item rented for no additional consideration. Full payment of the rental fee must be made before or at the beginning of each term. In order to acquire ownership of an item, consumers ordinarily must pay a total price far in excess of fair market value. DEF does not offer consumer items for immediate sale.

Appellants Delilah Miller and Craig Stenzel both have entered into rent-to-own contracts with DEF over a period of several years. For example, on December 18, 1990, Miller entered into a rent-to-own transaction with DEF for a used washer and dryer, the stated cash price of which was $800.75. Under the contract, Miller could acquire ownership of the washer and dryer by making 16 monthly payments of $84.40, for a total of $1,350.40, or by making 69 weekly payments of $21.10, for a total of $1,455.90. As a further example, on October 17, 1990 Stenzel entered into a rent-to-own transaction with DEF for a 19″ color television, the stated cash price of which was $470. Under the contract, Stenzel could acquire ownership of the television by making 18 monthly payments of $47.70, for a total of $858.60, or by making 78 weekly payments of $12.75, for a total of $994.50. Some of the contracts Miller and Stenzel have entered into have resulted in completed purchases; others have not.

On April 7, 1992 appellants Stenzel and Miller filed a class action lawsuit against DEF seeking monetary damages as well as declaratory and injunctive relief. In the relevant counts of appellants' complaint, appellants allege that DEF has violated various consumer protection statutes by failing to treat rent-to-own transactions as credit sales under the Consumer Credit Sales Act, and that DEF has engaged in usury in violation of Minn.Stat. § 334.01. On August 3, 1992, appellants moved for partial summary judgment, asking for a declaratory judgment that respondents' contracts constitute credit sales. On August 5, 1992, DEF moved for partial summary judgment, seeking dismissal of appellants' usury claim.

On November 30, 1992, the district court filed an order which granted appellants' motion for summary judgment and declared

contracts entered by "Class One"[1] to be "consumer credit sales for all purposes within the meaning of Minn.Stat. § 325G.15 and 325G.16." The court also denied DEF's motion for summary judgment and instead granted summary judgment for appellants on their usury claim, reserving the measure of damages for the fact finder.

After granting discretionary review, the court of appeals issued an opinion on August 3, 1993, reversing the district court. *Miller v. Colortyme, Inc.*, 504 N.W.2d 258 (Minn. App.1993). The court of appeals held: (1) DEF's rent-to-own agreements are not "consumer credit sales" for all purposes within the meaning of Minn.Stat. §§ 325G.15 and 325G.16, and (2) DEF's agreements are not usurious under Minn.Stat. § 334.01. While not reaching the issue, the court of appeals further suggested that the Rental Purchase Agreements Act (RPAA), Minn.Stat. §§ 325F.84–.98, is in substantial conflict with the Consumer Credit Sales Act (CCSA), Minn.Stat. §§ 325G.15 and 325G.16, and that the provisions of the RPAA are controlling. This appeal followed.

## I.

We consider first whether the CCSA defines rent-to-own agreements as consumer credit sales, thereby departing from the common law distinction between leases and sales in order to provide the same protections to consumers who engage in rent-to-own transactions as to consumers who engage in traditional credit sales. At common law a rent-to-own transaction is regarded as a lease and not a sale because a buyer is not bound to pay the total purchase price and can terminate a transaction at any time by returning the property. *See* Samuel Williston, *The Law Governing Sales of Goods at Common Law and Under the Uniform Sales Act*, § 336 (1948). Prior to enactment of the CCSA this court followed the common law distinction. *Hughes v. Becker*, 260 Minn. 83, 87, 108 N.W.2d 781, 783 (1961).

■ The CCSA was originally enacted in 1971. In 1981 the legislature amended Minn.

Stat. § 325G.15, subd. 5 of the CCSA to define certain terminable leases as a "sale of goods." Act of March 27, 1981, ch. 10, § 1, 1981 Minn.Laws 18–19. Under the amended version of Minn.Stat. § 325G.15, subd. 5, the term "sale of goods" includes:

> a contract in the form of a terminable bailment or lease of goods if: (a) the bailee or lessee has the option to renew the contract by making the payments specified in the contract; (b) the contract obligates the bailor or lessor to transfer ownership of the property to the bailee or lessee for no other or a nominal consideration upon full compliance by the bailee or lessee with the bailee's or lessee's obligations under the contract including any obligation incurred by reason of the exercise of an option by the bailee or lessee to renew the contract; and (c) the payments contracted for by the bailee or lessee, including those payments pursuant to the exercise of an option by the bailee or lessee to renew the contract, are substantially equivalent to or in excess of the aggregate value of the property and services involved.

It is undisputed that DEF's contracts satisfy each of the above criteria and therefore constitute a "sale of goods" within the meaning of Minn.Stat. § 325G.15, subd. 5. First, under DEF's contracts the lessee has the option to renew the contract by making advance rental payments at the beginning of each rental term. Second, the contracts obligate DEF to transfer ownership to the consumer if the consumer renews the agreement for a specified number of payments. Third, the total payments necessary to acquire ownership exceed the value of the property and services provided by respondents.

■ Given that rent-to-own contracts are "sales of goods" within the meaning of Minn. Stat. § 325G.15, subd. 5, the question is whether they are protected "consumer credit sales" within the meaning of Minn.Stat. § 325G.15, subd. 2. Under Minn.Stat. § 325G.15, subd. 2, a "consumer credit sale" is defined as:

1. The November 30 order grants appellants' motion for class certification as to Class One. Class One consists of individuals who entered rent-to-

own contracts after April 7, 1986 that provide for ownership at the end of a predesignated term without requiring an additional balloon payment.

[A] sale of goods or services in which (a) credit is granted by a seller who regularly engages as a seller in credit transactions of the same kind; (b) the buyer is a natural person; and (c) the goods or services are purchased primarily for a personal, family or household purpose, and not for commercial, agricultural, or business purpose.

The court of appeals concluded that DEF's rent-to-own transactions are not protected "consumer credit sales." It reasoned that DEF does not grant credit to customers because customers prepay for use of leased goods with no further obligation. *Miller v. Colortyme*, 504 N.W.2d at 260.

We believe rent-to-own transactions are "consumer credit sales" within the meaning of Minn.Stat. § 325G.15, subd. 2. The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature. By defining certain terminable leases as "sales" within the CCSA, the legislature has made clear its intent to subject these terminable leases to the same consumer protection laws as ordinary credit sales. There is no conceivable reason why the legislature would amend Minn.Stat. § 325G.15, subd. 5 to define certain terminable leases as sales if it did not intend such leases to be protected "consumer credit sales" within the meaning of Minn.Stat. § 325G.15, subd. 2. The interpretation of the CCSA adopted by the court of appeals renders meaningless the language in Minn. Stat. § 325G.15, subd. 5 defining certain terminable leases as sales.

■ DEF argues that a seller cannot be deemed to have extended "credit" in the absence of a buyer who has incurred debt. The word "credit" can have different meanings in different statutes and we do not believe it is appropriate to apply a narrow definition of credit in this context. The manifest purpose of the Consumer Credit Sales Act is consumer protection. As a remedial statute, it is entitled to a liberal construction to promote, not frustrate, its objectives. *Governmental Research Bureau v. Borgen*, 224 Minn. 313, 28 N.W.2d 760 (1947). The legislature has specifically defined the transactions at issue as sales, despite their terminable nature. Sales are ordinarily regarded as "credit sales" where a buyer acquires possession but is allowed to defer full payment. *See* Black's Law Dictionary 369–70 (6th Ed.1990). Accordingly, we hold that rent-to-own transactions are credit sales within the meaning of Minn.Stat. § 325G.15, subd. 2 because buyers of goods are not required to make full payment upon acquiring possession but are allowed to pay for goods sold over time.[2]

## II.

■ Minn.Stat. § 325G.16, subd. 4 provides that "[a]ny lease or bailment of goods which constitutes a consumer credit sale shall be deemed to be a sale for all purposes." Because rent-to-own agreements are consumer credit sales for all purposes, they are subject to the same consumer protection laws as ordinary credit sales, including the general usury statute, Minn.Stat. § 334.01.[3] We must decide whether the district court erred in holding that respondents' contracts are usurious as a matter of law and granting summary judgment for appellants.[4]

2. By defining rent-to-own transactions as "sales," the legislature recognized that the economic reality of these transactions is like that of ordinary credit sales, despite their terminable nature. As the consumer of a rent-to-own product continues making weekly or monthly payments under the contract, the pressure to keep making payments and to exercise the purchase option grows until it becomes the only feasible rational choice, given the alternative of completely forfeiting all past payments and returning the goods.

3. The usury statute provides, in relevant part: The interest for any legal indebtedness shall be at the rate of $6 upon $100 for a year, unless a different rate is contracted for in writing. No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater sum, or any greater value, for the loan or forbearance of money, goods, or things in action, than $8 on $100 for one year.

4. There are several statutory exceptions to the general usury statute applying to specific types of credit transactions, but none of these exceptions are applicable to the rent-to-own agreements at issue. The rent-to-own contracts at issue also are not exempt from the usury statute under the judicially created time-price doctrine. This doctrine may apply where a seller fixes one price for cash and another price for credit. Respondents do not offer consumer items for immediate sale.

We have held that four elements must be proven to establish a violation of the usury law:

    (1) a loan of money or forbearance of debt,

    (2) an agreement between the parties that the principal shall be repayable absolutely,

    (3) the exaction of a greater amount of interest or profit than is allowed by law, and

    (4) the presence of an intention to evade the law at the inception of the transaction.

*Citizen's Nat'l Bank of Willmar v. Taylor,* 368 N.W.2d 913, 918 (Minn.1985).[5]

DEF argues that its rent-to-own contracts are not usurious because they do not involve a forbearance of debt and do not impose an absolute obligation to repay a principal amount. In usury law, the term "forbearance" signifies the "contractual obligation of a lender or creditor to refrain, during a given period of time, from requiring the borrower or debtor to pay a loan or debt then due and payable." *Rathbun v. W.T. Grant Co.,* 300 Minn. 223, 233, 219 N.W.2d 641, 648 (1974). We agree with DEF that rent-to-own consumers technically do not incur any debt because they pay in advance for each rental period and are never obligated to renew an agreement. We also agree with DEF that a rent-to-own consumer technically has no absolute obligation to repay a principal amount. We disagree, however, that the first two common law elements of usury can be applied here to defeat appellants' usury claim where the legislature has defined rent-to-own transactions as "consumer credit sales" for all purposes.

The purpose of the usury law is to protect consumers by limiting the amount of interest which can be charged on a credit sale or loan. The first two common law elements of usury serve merely to clarify what transactions are subject to interest rate limitations. By defining rent-to-own transactions in the CCSA as "consumer credit sales" for all purposes, the legislature has established that consumers who enter into rent-to-own transactions are to benefit from the same protections as consumers who purchase goods through ordinary installment sales, even though rent-to-own consumers do not actually incur any debt and do not have any obligation to repay a principal amount. Consequently, the first two common law elements of usury are met by operation of statute.

The legislature's decision to treat rent-to-own transactions as credit sales recognizes that although these transactions purport to be short-term leases, they operate in substance much like ordinary installment sales. Consumers who purchase goods through rent-to-own agreements may not incur debt, but they still implicitly pay interest in return for the ability to pay for goods over time. Moreover, rent-to-own customers may not have an absolute obligation to repay a principal amount, but their situation is analogous to that of ordinary buyers on credit in that they must either forfeit possession of a good or continue paying for it. *See supra,* note 2.

In addressing the scope of the usury statute, we look through the form to the substance of a transaction. *Rathbun,* 300 Minn. at 235, 219 N.W.2d at 649.[6] "There is no shift or device on the part of the lender to evade the [usury] law under or behind which the law will not look to ascertain the real nature and object of the transaction." *Adjustment Service Bureau, Inc. v. Buelow,* 196 Minn. 563, 567, 265 N.W. 659, 661 (1936).

---

**5.** Minn.Stat. § 334.011, subd. 2 (1992) provides that if a greater rate of interest than that allowed is charged then the entire interest due on that note, bill or other evidence of debt is forfeited. In addition, if the greater rate of interest has been paid, the person who paid it may recover in a civil action an amount equal to twice the amount of interest paid.

**6.** In *Rathbun,* defendant offered for sale retail installment credit coupon books. A customer could purchase on credit a book of coupons in denominations ranging from 50 cents to $10, and totalling from $10 to $200, which could be used towards a purchase of merchandise at defendant's stores. For coupon books sold after January 1, 1971 finance charges accrued after the first coupon was actually used, and all coupons could be returned at any time without charge. A customer who returned unused coupons was given full credit, including credit for finance charges attributable to the unused coupons. Even though the customer could return the coupons unused for full credit, the court held that the contracts were usurious.

Having determined that the first two elements of the common law usury test are met by operation of statute, we turn to whether the district court was correct in determining that respondents intentionally charged an excessive amount of interest. Under Minn.Stat. § 334.01, the interest for any legal indebtedness generally shall be no greater than six percent.[7] DEF acknowledges the large disparity between the cost of purchasing goods through its rent-to-own agreements and the value of the goods sold, but alleges that there is a factual issue with respect to whether it charged excessive interest, because the total value of goods and services (e.g., free delivery and maintenance) provided by DEF is disputed. We disagree. While there is some question as to the total value of services provided by DEF, DEF offered virtually no evidence to the district court as to the value of such services. Based on the record, we agree with the district court that no reasonable fact finder could conclude that the difference between the total payments required under the contracts and the value of the goods and services extended amounts to as little as six percent of the total payments. The district court properly concluded that DEF charged an excessive amount of interest as a matter of law.

DEF also argues that it did not have the requisite intent necessary to satisfy a usury claim because it acted in good faith and did not intend to violate the law. To be guilty of violating the usury law, a lender need only intend to charge a rate that is in fact usurious. It matters not whether the lender knows he is violating the usury law. *Citizen's Nat'l Bank of Willmar v. Taylor,* 368 N.W.2d at 919. DEF does not claim that it intended to collect less money than is stated on the contracts, and therefore, as a matter of law DEF had the requisite intent.

Because no genuine issue of material fact exists as to whether DEF intentionally charged an excessive rate of interest, the district court properly granted summary judgment for appellants on their usury claim.

## III.

We finally consider DEF's argument that the Rental Purchase Agreement Act, Minn.Stat. §§ 325F.84–.98, has repealed the Consumer Credit Sales Act. The RPAA was enacted in 1990 and provides a number of protections to rent-to-own consumers. Among these, the RPAA provides for specified disclosures in the rent-to-own agreement, in advertising, and on in-store merchandise tags (sections 325F.86–.88); imposes restrictions and protections in the event of default (section 325F.89); provides for reinstatement rights to consumers (section 325F.90); limits delivery charges, security deposits and collection fees (section 325F.91); authorizes the commissioner of commerce to adopt rules governing cash price limits (section 325.91); prohibits identified abusive debt collection practices (section 325F.92); and provides for enforcement through both the Attorney General and a private right of action (section 325F.97).

The RPAA on its face does not purport to set up an exclusive system regulating rent-to-own contracts. Section 325F.85 of the RPAA specifically addresses the relationship between the RPAA and the CCSA, and provides:

> If the consumer protection provisions of sections 325F.84 to 325F.97 conflict with sections 325G.15 and 325G.16, sections 325F.84 to 325F.97 apply to a rental-purchase agreement and supersede sections 325G.15 and 325G.16.

Moreover, section 325F.97, subd. 2 of the RPAA provides that the remedies under the RPAA "are cumulative and shall not be construed as restricting any remedy that is otherwise available."

The RPAA's legislative history further indicates that the RPAA was not intended to repeal the CCSA. As originally proposed, the RPAA would have explicitly excluded applicability of the CCSA. Amendments, however, were subsequently adopted which deleted the provisions repealing the CCSA and which substituted the present language of section 325F.85.

---

7. Section 334.01 permits an interest rate of eight     percent if the rate is contracted for in writing.

Despite this statutory language and legislative history, DEF suggests that the RPAA impliedly repeals the CCSA. Under Minn.Stat. § 645.39 (1992), where a later law does not purport to establish an exclusive system covering an subject matter, a later law shall only be construed as impliedly repealing earlier laws on the same subject where the two laws are irreconcilable. A statute is to be construed, whenever reasonably possible, in such a way as to avoid irreconcilable differences and conflict with another statute. *Erickson v. Sunset Memorial Park Assoc.*, 259 Minn. 532, 543, 108 N.W.2d 434, 441 (1961).

DEF points to a number of differences and conflicts between the CCSA and the RPAA, but none of these are irreconcilable. First, DEF notes that although the RPAA imposes express limitations on charges for certain items in rent-to-own agreements (e.g., delivery fees, security deposit, penalty for early termination), it does not impose an express limitation on the total amount that customers can be charged. DEF additionally notes that although the RPAA requires disclosure of the difference between the "cash price" and the amount of total payments, using the term "cost of lease services," it does not impose any express limitation on what may be charged for lease services. However, the fact that the RPAA fails to impose any caps on total payments or on interest rates does not create an irreconcilable conflict with the CCSA because the consumer protections provided by the two statutes can be treated as cumulative.

Next, DEF argues that if the legislature intended rent-to-own transactions to be "credit sales" for all purposes, it would not have enacted a statute regulating such transactions which is replete with lease terminology. For example, in the RPAA, the person who rents personal property under a rent-to-own agreement is defined as the "lessee," and the person who offers property for rent is defined as the "lessor." Minn.Stat. § 325F.84. However, use of terms such as "lessee" and "lessor" in and of itself does not create an irreconcilable conflict with the CCSA. The CCSA itself uses terms like "lessor" and "lessee" to describe rent-to-own transactions, only to further define these kinds of transactions as "sales of goods." *See* Minn.Stat. § 325G.15, subd. 5.

DEF also points out that among the disclosures required by the RPAA, a customer must be told that she will not own the property until she has made the total payments necessary to acquire ownership of the property. Minn.Stat. § 325F.86(e). DEF argues that this provision conflicts with 325G.16, subd. 4 of the CCSA, which requires the lessor's interest to be treated as a "security interest." The disclosure requirement in the RPAA, however, is for the protection of the consumer and merely serves to ensure the consumer is made aware that *absolute* ownership will not pass prior to full payment.

DEF finally claims that the two statutes cannot be reasonably reconciled because, if the CCSA is deemed to impose an interest rate cap, this cap combined with the early-purchase option required by the RPAA would force defendants to sell their goods at below market value.[8] Appellants, however, cite a number of ways in which respondents can manipulate the contract terms to realize profits even if the early purchase option is exercised (e.g. by increasing the length of the initial rental period, requiring an initial downpayment, decreasing the number of payments necessary to acquire ownership), and in any event, lost profits is not a valid defense to a usury claim.

We conclude that the RPAA does not repeal the CCSA; rather the remedies in the two statutes are cumulative. We reverse and remand to the district court for further proceedings.

---

**8.** Under the early-purchase option requirement, lessors must allow customers to acquire ownership of a property any time after the first periodic payment is made by tendering 55% of the difference between the total of scheduled payments and the total amount paid on the account. Minn.Stat. § 325F.93 (1992).