JOY SILVA & another[1] vs. RENT-A-CENTER, INC., & others.[2]

Suffolk. June 9, 2009. - September 10, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Supreme Judicial Court,* Certification of questions of law. *Massachusetts Retail Instalment Sales Act. Consumer Lease Act. Statute,* Construction. *Consumer Protection Act,* Lease. *Uniform Commercial Code,* Secured transaction. *Words,* "Rent-to-own contract."

This court concluded that the Massachusetts Retail Instalment Sales Act, G. L. c. 255D, did not apply to a certain contract that was in essence a one-week rental contract with multiple options to renew, where the contract did not require the consumer to pay a sum substantially equivalent to or in excess of the value of the goods involved, nor did the contract permit the consumer, on full compliance with his obligations under the contract, to become the owner of the goods involved for a nominal consideration, or obligate the consumer to pay a specified amount that he had undertaken to pay in more than one payment. [671-676] IRELAND, J., concurring.

This court concluded that the Massachusetts Consumer Lease Act, G. L. c. 93, §§ 90-92, would apply to a certain contract to rent computer equipment, where the stated rental period was one week and where the contractual obligation did not exceed $25,000, provided that the computer equipment was rented primarily for personal, family, or household purposes, a question that was not capable of determination on the record. [676-679] IRELAND, J., concurring.

Discussion of the law governing rent-to-own transactions in other jurisdictions. [679-682]

CERTIFICATION of a question of law to the Supreme Judicial Court by the United States District Court for the District of Massachusetts.

*Seth R. Lesser,* of New York (*Matthew E. Miller & Christopher Weld, Jr.,* with him) for the plaintiffs.

---

[1] Jaaziel Costa. The record indicates that plaintiffs Joy Silva and Jaaziel Costa brought the case in the Federal District Court for the District of Massachusetts on behalf of themselves and all others similarly situated; it does not appear on this record, however, that a class has been certified. Neither the certified question nor the undisputed facts concern Silva, and we do not consider claims concerning her.

[2] Rent-A-Center East, Inc., and Rentway, Inc. We refer to the defendants collectively as "Rent-A-Center," "RAC," or "defendants."

*Beth I. Z. Boland* (*Ron DeMoss* with her) for the defendants.
The following submitted briefs for amici curiae:

*John Pagliaro, Martin J. Newhouse, & Jo Ann Shotwell Kaplan* for New England Legal Foundation & another.

*Stuart T. Rossman* for National Consumer Law Center & others.

*Edward L. Winn, III*, of Texas, for Association of Progressive Rental Organizations & another.

MARSHALL, C.J. From children's musical instruments, dormitory refrigerators, and furniture used to stage prospective homes, to seasonal sporting equipment, televisions, and other consumer goods, the modern economy offers consumers diverse opportunities for leasing a variety of products. See Rohner, Leasing Consumer Goods: The Spotlight Shifts to the Uniform Consumer Leases Act, 35 Conn. L. Rev. 647, 649 (2003). A judge of the United States District Court for the District of Massachusetts, considering a "consumer lease agreement" for computer equipment, concluded that "[n]o authorities convincingly 'show how the highest court in the state would decide' " which of two statutory schemes regulate that type of arrangement, and certified the following question to this court pursuant to S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981):

> "Is a contract in the form of Exhibit A, entered into within the [Commonwealth] of Massachusetts, subject to the terms of the Massachusetts Consumer Lease Act, [G. L. c. 93, §§ 90] et seq., or the Massachusetts Retail Installment Sales Act, [G. L. c. 255D]?"

On the scant facts in the record before us, we cannot answer the question definitively.[3] Cf. S.J.C. Rule 1:03, § 3 (2) (requiring "statement of all facts relevant to the questions certified and

---

[3]The parties' reliance on facts not in the record here "renders us ill equipped to pass on the question [submitted to us]. . . . We cannot base our decision on facts not contained in the record." *Love* v. *Massachusetts Parole Bd.*, 413 Mass. 766, 768 (1992). See *Currens* v. *Assessors of Boston*, 370 Mass. 249, 253-254 (1976); *H.B. Budding Co.* v. *Boddie*, 331 Mass. 267, 269-270 (1954). See also Mass. R. A. P. 16 (e), as amended, 378 Mass. 940 (1979); *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 69 n.9 (1997) (appellate courts may take judicial notice of facts of common knowledge). Likewise, while the parties have asserted claims and made arguments tangential to the certified question, those claims are not before us. We confine our analysis to the

showing fully the nature of the controversy in which the questions arose"). Nonetheless, the bare legal issue concerns a significant point of Massachusetts law on which we will offer what guidance is possible on this record. See *Knapp Shoes, Inc.* v. *Sylvania Shoe Mfg. Corp.*, 418 Mass. 737, 738 n.1 (1994) (where certified question raised significant issue, court would assume evidentiary record supported judge's pertinent factual findings and legal conclusions). Cf. *Canal Elec. Co.* v. *Westinghouse Elec. Corp.*, 406 Mass. 369, 372 (1990), quoting *Schlieter* v. *Carlos*, 108 N.M. 507, 509 (1989) (if "questions certified to us . . . are not accompanied by sufficient nonhypothetical, evidentiary facts to allow us to adequately determine" answers, court might decline to answer).[4]

The certified question concerns a specific contractual form. On these facts, we can and do conclude that the Massachusetts Retail Instalment Sales Act (RISA), G. L. c. 255D,[5] does not apply to it. Further, if we assume defendants Rent-A-Center, Inc.;

---

certified question. See *Phillips* v. *Pembroke Real Estate, Inc.*, 443 Mass. 110, 114 n.7 (2004); *Woodward* v. *Commissioner of Social Sec.*, 435 Mass. 536, 538 (2002); *Canal Elec. Co.* v. *Westinghouse Elec. Corp.*, 406 Mass. 369, 370 n.1 (1990).

[4]We acknowledge the amicus brief in support of the plaintiffs filed by the National Consumer Law Center, National Association of Consumer Advocates, Consumer Federation of America, MASSPIRG/U.S. PIRG, Legal Assistance Corporation of Central Massachusetts, Neighborhood Legal Services, South Coastal Counties Legal Services, Greater Boston Legal Services, and Massachusetts Law Reform Institute. We also acknowledge the amicus briefs in support of the defendants filed by the Association of Progressive Rental Organizations and the Northeast Rental Dealers Association; and New England Legal Foundation and Associated Industries of Massachusetts.

[5]General Laws c. 255D, § 1, defines a "retail installment sale agreement" as "an agreement, other than a revolving credit agreement or agreement reflecting a sale made pursuant thereto, signed by the buyer in this commonwealth, involving a finance charge and providing for the sale of goods or the rendering of services or both, or for the issuance of merchandise certificates, for a specified amount which the buyer undertakes to pay in more than one payment subsequent to the making of the agreement, or not involving a finance charge and providing for the sale of goods or the rendering of services or both, or for the issuance of merchandise certificates, for a specific amount which the buyer undertakes to pay in five or more installments subsequent to the making of the agreement. . . . 'Retail installment sale agreement' shall also include any contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the value of goods involved and it is agreed that the bailee or lessee will become, or for no other or for a nominal consideration has the

Rent-A-Center East, Inc.; and RentWay, Inc. (collectively, "Rent-A-Center," "RAC," or defendants),[6] regularly are engaged in the business of leasing personal property, G. L. c. 93, § 90,[7] and that the computer equipment was intended "primarily for personal, family, or household purposes," *id.*, factual questions that are not resolved on the record before us, we conclude that the agreement would be subject to the Consumer Lease Act (CLA), G. L. c. 93, §§ 90-92.

1. *Discussion.* The parties stipulated to the following facts: "On or about May 13, 2006, Jaaziel Costa entered into an agreement with Rent-A-Center . . . at its Worcester, Massachusetts store," it was "drafted by RAC," and it "concerned a used Dell laptop computer."[8] The agreement, entitled a "Consumer Lease Agreement," specifies a weekly "rental term," with a total payment of $39.49, consisting of a "rental payment" of $34.99, an "optional liability damage waiver" of $2.62, and tax of $1.88."[9] It provides that, at the end of the rental term (here weekly), Costa may either (1) continue to rent the property by making another rental payment; or (2) terminate the lease by

option to become the owner of the goods upon full compliance with his obligations under the contract. A retail installment sale agreement shall not include an agreement which provides (*a*) for the payment of the total sale price in no more than three monthly installments and (*b*) a finance charge not in excess of one dollar and (*c*) no collateral security for the seller."

[6]The consumer lease agreement stands in the name of Rent-A-Center, as lessor, although neither the copy contained in the record nor that submitted by the parties postargument was executed by the lessor.

[7]The Consumer Lease Act (CLA), G. L. c. 93, § 90, was inserted by St. 1986, c. 419 ("An Act relative to consumer leases"). It defines a "[c]onsumer lease" as "a contract in the form of a lease or bailment for the use of personal property by a natural person for a period of time of four months or less, and for a total contractual obligation not exceeding twenty-five thousand dollars, primarily for personal, family, or household purposes, whether or not the lessee has the option to purchase or otherwise become the owner of the property at the expiration of the lease, except that such term shall not include any of the following: . . .

"(5) a lease or agreement which constitutes a retail installment transaction as defined in section one of chapter two hundred and fifty-five D."

[8]The parties also submitted to the United States District Court a joint report concerning two groups of additional proposed facts. Nothing suggests those facts are undisputed.

[9]Costa also could elect to make advance payments on a semimonthly or monthly basis.

returning "the rental property and pay[ing] all rental payments and other charges due through the date of return." The agreement further states that RAC is "responsible for maintaining or servicing the property while it is being leased," and that it "retain[s] title to the property at all times and will pay any taxes which might be levied on the property." Under the agreement, Costa is "not obligated to renew this lease and may terminate it at any time without penalty and with no further obligation. To do so, you must return the rental property and pay all rental payments and other charges due through the date of return." The agreement further specifies that Costa may "choose to acquire ownership" by "rent[ing] the property for the [specified] number of weeks" shown in the contract. According to the agreement, "You do not own the property," and "[y]ou will not own the property until you have made the total payment necessary to acquire ownership." In addition, Costa has the "right to exercise an early purchase option. If you wish to purchase the rental property you may do so at any time by the payment of 55% of the remaining Total of Payments calculated at that time." Finally, the agreement specifies that Costa may not "sell, mortgage, pawn, pledge, encumber, hock or dispose of" the property, and that the agreement has been pledged to the lessor's bank as collateral security.

To determine whether the Legislature intended either RISA or CLA to apply to Costa's agreement, we consider both statutes in turn, mindful of the established canon of statutory construction that "general statutory language must yield to that which is more specific." *TBI, Inc.* v. *Board of Health of N. Andover*, 431 Mass. 9, 18 (2000), quoting *Risk Mgt. Found. of Harvard Med. Insts., Inc.* v. *Commissioner of Ins.*, 407 Mass. 498, 505 (1990).[10]

a. *Retail Instalment Sales Act.* Enacted in 1966, RISA regulates retail instalment sales contracts. See Wilkins, The New Massachusetts Retail Installment Sales Act, 51 Mass. L. Q. 205, 207 (1966). The plaintiffs in this case contend that "rent-to-own" agreements, like the agreement executed by Costa, effectively are retail instalment agreements subject to RISA that have been mischaracterized by the defendants as leases. The agreement before us, however, does not satisfy the statutory

[10]This type of arrangement is referred to by the parties and others as a "rent-to-own" transaction. See Hawkins, Renting the Good Life, 49 Wm. & Mary L. Rev. 2041, 2047-2048 (2008).

definition. RISA initially defined a "[r]etail installment sale agreement" as follows:

> "[A]n agreement, other than a revolving credit agreement or an agreement reflecting a sale made pursuant thereto, entered into in this commonwealth, involving a *finance charge* and providing for the *sale of goods* or the rendering of services or both *for a specified amount* which the buyer undertakes to pay in more than one payment subsequent to the making of the agreement. A retail installment sale agreement shall not include an agreement which provides (*a*) for the payment of the time sale price in not more than three monthly installments and (*b*) a finance charge not in excess of one dollar and (*c*) no collateral security for the seller." (Emphasis added.)

St. 1966, c. 284, § 1. Under that original definition, a bona fide lease terminable at the option of the consumer, such as Costa's agreement, would not qualify as an "installment sale agreement." Among other things, no calculable "finance charge" is involved. A "finance charge" was defined as an amount exceeding the "cash sale price" of the goods and any insurance or "official fees." *Id.* See McCormack, Consumer Protection, 1968 Ann. Survey Mass. L. 129, 132 (RISA likely inapplicable to "bona fide" leases because such leases do not involve finance charges). The Legislature amended the statute in 1971, amplifying the definition of "retail installment sale agreement" to include agreements nominally in the form of a bailment or lease:

> "[A]n agreement, other than a revolving credit agreement or an agreement reflecting a sale made pursuant thereto, signed by the buyer in this commonwealth, involving a finance charge and providing for the sale of goods or the rendering of services or both for a specified amount which the buyer undertakes to pay in more than one payment subsequent to the making of the agreement, or not involving a finance charge and providing for the sale of goods or the rendering of services or both for a specific amount which the buyer undertakes to pay in five or more installments subsequent to the making of the agreement. *'Retail installment sale agreement' shall also include any contract in the form of a bailment or lease if the bailee or*

> *lessee contracts to pay as compensation for use a sum*
> *substantially equivalent to or in excess of the value of the*
> *goods involved and it is agreed that the bailee or lessee*
> *will become, or for no other or for a nominal consideration*
> *has the option to become the owner of the goods upon full*
> *compliance with his obligations under the contract.* A
> retail installment sales agreement shall not include an
> agreement which provides (*a*) for the payment of the
> deferred payment price in not more than three monthly
> installments and (*b*) a finance charge not in excess of one
> dollar and (*c*) no collateral security for the seller."
> (Emphasis added.)

St. 1971, c. 341, § 1. Although the statute has since been
amended, the language concerning contracts in the form of a
lease or bailment has remained substantively unchanged. See
G. L. c. 255D, § 1. The statute thus recognizes that leases may
be characterized as instalment sales only if specific requirements
are satisfied.

Under RISA's definition, Costa's rent-to-own agreement is
not an "installment sale agreement." Not only does Costa's
agreement not *require* (as opposed to permit) him to pay a "sum
substantially equivalent to or in excess of the value of the goods
involved," G. L. c. 255D, § 1, but it does not permit him, "upon
full compliance with his obligations under the contract" for the
original term, to become the owner for a "nominal considera-
tion."[11] *Id.* Moreover, the agreement does not obligate Costa to
pay "a specified amount which the buyer undertakes to pay in
more than one payment." G. L. c. 255D, § 1. Costa is obliged
to make no payment other than the first weekly payment, and
there is no "contract[] to pay" a sum substantially equivalent to
the value of the item. *Id.* In essence, Costa's contract is a one-
week rental contract with multiple options to renew. See *Crumley
v. Berry*, 298 Ark. 112, 115 (1989) (in considering whether rent-
to-own contract is disguised conditional sale, analysis focuses
first on whether there is "obligation to pay the equivalent of the
purchase price").

---

[11]For a lease to qualify as a "retail installment sale agreement" it must satisfy
both definitional requirements. That is, it must obligate the consumer to pay an
amount substantially equivalent to, or in excess of, the goods involved *and* the
consumer must have the option to become the owner for no other or nominal
consideration on full compliance with his or her contractual obligations.

In this case, the absence of any obligation on the part of Costa to pay a sum substantially equivalent to the value of the leased computer is decisive. In *Crumley* v. *Berry, supra,* for example, the Supreme Court of Arkansas considered whether, under the Arkansas retail instalment sale act, a "rent-to-own" contract was a bona fide lease, or a disguised sale. In concluding that the transaction was a lease, the court noted that the lease was "[w]ithout any requirement to pay throughout the contract" and that the lessee had the "corresponding right to terminate the contract at any time." *Id.* at 117. Other jurisdictions, construing similar legislation and similar rent-to-own leases, are in accord. See, e.g., *Givens* v. *Rent-A-Center, Inc.,* 720 F. Supp. 160 (S.D. Ala. 1988); *Hawkes Television, Inc.* v. *Maine Bur. of Consumer Credit Protection,* 462 A.2d 1167 (Me. 1983); *State* v. *Action TV Rentals, Inc.,* 297 Md. 531, 533 (Ct. App. 1983) (rent-to-own contract did not satisfy Maryland's RISA statute because lessee did not make "enforceable promise" to pay an amount at least substantially equivalent to value of goods); *Griffin* v. *Rent-A-Center, Inc.,* 843 A.2d 393 (Pa. Super. Ct. 2004).

It may be that if a consumer exercises his or her right to renew a consumer lease multiple times, the lease payments eventually will exceed the value of the item. But application of a regulatory framework does not depend on the economics of hindsight. We look, instead, to the nature of the contract at the time it was formed, focusing on the parties' contractual rights and obligations at that point. See 4 J.J. White & R.S. Summers, Uniform Commercial Code § 30-3, at 19 (5th ed. 2002) ("Even though certain events or facts that determine the economic consequences of the deal have occurred or exist only at the conclusion of the lease, the agreement is either a lease or a security agreement from the beginning"). In short, because Costa's contract did not require payments totaling an amount substantially equivalent to the value of the leased item, the mere possibility of a nominal purchase option if he undertook multiple renewals of the lease term did not make the transaction an instalment sale within the meaning of RISA. See H.J. Alperin & R.F. Chase, Consumer Law § 8.22, at 28-29 (2d ed. 2001) ("It is clear that contracts in the form of a bailment or lease are not credit sales if the consumer has the right to terminate the arrangement at any time without penalty. This excludes [from RISA] rental-purchase or 'rent to own' agree-

ments, under which the consumer ostensibly rents personal property for a minimum one-week or one-month period but has the option of acquiring title to the property by continuing the rental for a specified number of successive periods").

This construction of RISA is consistent with similar language contained in its Federal counterpart, the Federal Truth-in-Lending Act, 15 U.S.C. §§ 1601 et seq (2006). The Truth-in-Lending Act defines a "credit sale" as:

> "[A]ny contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become, or for no other or a nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract."

*Id.* at § 1602(g). Regulation Z, 12 C.F.R. § 226.2(a)(16) (2009), further explains that a credit sale includes certain leases, but not those "terminable without penalty at any time by the consumer."[12] Because Costa's rent-to-own agreement permitted him to terminate it at any time without penalty, it was not a "credit sale" within the meaning of the Federal Truth-in-Lending Act, and it similarly does not involve an "extension of credit" under RISA. See G. L. c. 255D, § 1 (defining "[f]inance charge" as "the cost of credit determined in accordance with the provisions of" G. L. c. 140D); 209 Code Mass. Regs. § 32.02(1) (2002) (defining "[c]redit sale" to exclude a lease "terminable without penalty at any time by the consumer"); H.J. Alperin & R.F. Chase, Consumer Law, *supra* at § 13.10. In similar regard, in a 1996 letter ruling, the Massachusetts division of banks stated that for a lease to be considered a retail instalment sale agreement, it must "*require* payments substantially equivalent to or in excess of the value of the goods." LR 96-034 (Mar. 28, 1996) (entities entering into retail instalment sales agreements with

---

[12]General Laws c. 255D, § 31, provides that transactions subject to c. 255D also are subject to G. L. c. 140D, the consumer credit cost disclosure act. That chapter, in turn, provides that rules and regulations issued under the Truth-in-Lending Act will be considered advisory rulings under c. 140D, unless expressly rejected. G. L. c. 140D, § 3 (*b*).

consumers exempt from licensing requirements of G. L. c. 255D). Under the agreement at issue, Costa was obliged to pay a "weekly" rental in advance of the rental term, but he neither incurred a debt nor possessed a right to defer payment. RISA simply is not applicable.

Whether an agreement involves an extension of credit also is a significant factor in determining whether a retail instalment sale contract constitutes a secured transaction. Where the lessor retains title to the goods, and not a bare security interest to secure performance of a credit obligation, and the lessee may terminate the agreement at will, the retail instalment sales act is inapplicable. See 209 Code Mass. Regs. § 32.02 (defining "[c]redit" and "[s]ecurity interest"). As two commentators have noted:

> "A 'lease' terminable at the will of the lessee cannot be a security agreement. That is true even if the apparent lease term continues for the entire economic life or if there is a purchase option for nominal consideration at the end of the term. A prime example of this is the 'rent-to-own' agreement where a retailer leases a television or microwave to a consumer. The lease term is usually short — two weeks or one month — and the lease is renewed automatically unless the consumer returns the goods. The consumer may purchase the goods either by continuing payments for a certain period (such as 52 weeks) or by paying fair market value (usually computed on a sliding scale, such as 60% of all remaining payments). . . . A sale and security agreement cannot be found when the consumer has no obligation to pay the purchase price."

4 J.J. White & R.S. Summers, Uniform Commercial Code, *supra* at § 30-3, at 33-34. Federal bankruptcy courts repeatedly have rejected attempts to classify rent-to-own contracts either as secured transactions or instalment sales, concluding that such transactions do not create security interests under the Uniform Commercial Code. See, e.g., *In re Parker*, 363 B.R. 769 (Bankr. D.S.C. 2006); *In re Johnson*, 203 B.R. 498 (Bankr. S.D. Ga. 1996). In sum, a transaction structured as a lease, terminable at the will of the lessee without penalty, is not equivalent to an instalment sale contract.

b. *Consumer Lease Act.* Having concluded that RISA does not apply to Costa's rent-to-own agreement, we next consider

whether CLA does. That statute defines a "[c]onsumer lease" as:

> "[A] contract in the form of a lease or bailment for the use of personal property by a natural person for a period of time of four months or less, and for a total contractual obligation not exceeding twenty-five thousand dollars, primarily for personal, family, or household purposes, whether or not the lessee has the option to purchase or otherwise become the owner of the property at the expiration of the lease, except that such term shall not include any of the following: . . . (5) a lease or agreement which constitutes a retail installment transaction as defined in section one of chapter two hundred and fifty-five D; . . . (7) any lease or rental of an item of personal property that is leased or rented for fewer than seven consecutive days, including all renewals and extensions of the lease or rental agreement."

G. L. c. 93, § 90. When the CLA legislation was introduced in 1986, few States had enacted legislation having specific application to the rent-to-own industry. See Ga. Code Ann. § 10-1-680 (2009); Mich. Comp. Laws Ann. § 445.951 (West 2002); S.C. Code Ann. § 37-2-701 (West 2002); Tex. Bus. & Com. Code Ann. § 35.71(f) (since repealed). The language of the Massachusetts legislation clearly followed the model of the Federal Consumer Leasing Act of 1976, 15 U.S.C. §§ 1667-1667f (2006) (concerning personal property leases of more than four months). For example, it uses the phrase "consumer lease" contained in the Federal statute, rather than "rental-purchase," "lease-purchase," or "rent-to-own," terms that appear in later statutory enactments. See, e.g., Alaska Stat. § 45.35.010 (Lexis-Nexis 2008) (lease-purchases); Ariz. Rev. Stat. Ann. § 44.6801 (West 2003 & Supp. 2008) (rental-purchase); Conn. Gen. Stat. § 42-240 (2009) (rent-to-own). See also note 15, *infra*. The CLA defines "[c]onsumer lease" to apply to leases "for a period of time of four months or less," precisely the period left unregulated by the Federal CLA. Compare G. L. c. 93, § 90, with 15 U.S.C. § 1667 (applying consumer leases "for a period of time exceeding four months").

It is possible that each of the elements of a "consumer lease," as that term is defined in the CLA, is present in the Costa contract,

although the undisputed facts do not permit a definitive determination. The computer equipment may be "personal property"; the stated rental period is one week; and the contractual obligation does not exceed $25,000. On the record before us, however, we cannot determine whether the computer equipment was rented "primarily for personal, family, or household purposes."

Assuming those requirements are satisfied, we conclude that the "weekly" rental term of Costa's contract brings it within the regulatory scope of the CLA. The CLA requires that a lease term be for a period of four months or less. While a consumer may choose to renew an agreement for successive terms aggregating more than four months, that eventual choice does not preclude application of the CLA. The language of the statute indicates that the Legislature required consideration of such renewals and extension only in determining whether the statute applies to very short-term contracts — those for fewer than seven days — but not to the determination whether the maximum four-month period is exceeded.[13] Compare G. L. c. 93, § 90 (7) (CLA applies to leases or rentals of seven days or more "including all renewals and extensions of the lease or rental agreement"), with G. L. c. 93, § 90 (providing generally that CLA covers leases of four months or more, without mention of renewals or extensions). See H.J. Alperin & R.F. Chase, Consumer Law, *supra* at § 13:10, at 256 n.8. The regulations promulgated by the Attorney General, 940 Code Mass. Regs. § 6.11 (1993) (lease and rent-to-own transactions), support this construction. Those regulations characterize rent-to-own transactions as leases "for any minimum period of less than four months" as subject to the CLA, and consider them differently from instalment sales. See *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 772 (1980) ("we hold that the Legislature has, by G. L. c. 93A, § 2 [c], delegated to the Attorney General the power to promulgate rules and regulations

---

[13]The plaintiffs argue that the Legislature, in enacting the CLA, intentionally omitted the word "initial" in describing the maximum term of a lease agreement to which it applies, and that the CLA should apply only to very short-term leases that do not exceed four months, including all renewals and extensions. Not only have they cited no authority for this proposition, but there appears to have been no disagreement since the enactment of the CLA in 1986 that that statute governs rent-to-own transactions in this Commonwealth. See, e.g., H.J. Alperin & R.F. Chase, Consumer Law § 13.10, at 256 n.8 (2d ed. 2001).

defining with specificity acts and practices which violate G. L. 93A, § 2 [*a*]"; "[t]hese rules and regulations have the same force of law as those of any 'agency' as defined in G. L. c. 30A, § 1 [2]"").

The Federal Reserve Board (board) has analyzed the definition of "consumer lease" in the cognate Federal CLA, 15 U.S.C. § 1667(1), and its conclusions concerning calculation of a lease term are consistent with ours. The Federal statute begins where the Massachusetts statute ends: it applies only to consumer leases having a term of more than four months, see 12 C.F.R. § 213.2(e)(1) (2009) (Regulation M), while the Massachusetts statute applies to those with a term of four months or less.[14] The board's official staff commentary to Regulation M states that a three-month lease, extended on a month-to-month basis, is not covered by the Federal CLA, because the Federal act applies only to leases with a term of "*more* than four months" (emphasis added). 12 C.F.R. § 213.2 Supp. I comment 2(e)-2 (2009). The commentary concludes that the federally required four-month minimum term is ascertained by looking at the initial term, without regard to successive renewals. *Id.* See H.J. Alperin & R.F. Chase, Consumer Law, *supra* at § 13.10 ("Federal requirement that the lease be for more than four months means that the initial term of the lease must be more than four months"). In other words, the Federal CLA does not apply to week-to-week, or month-to-month, agreements, even though such consumers have the right (but not the obligation) to extend such agreements to four months or more. See *In re Hanley*, 135 B.R. 311 (Bankr. C.D. Ill. 1990); *Lemay* v. *Stroman's, Inc.*, 510 F. Supp. 921 (E.D. Ark. 1981).

c. *Other jurisdictions.* Forty-seven States, including Massachusetts as well as Guam, Puerto Rico, and the District of Columbia, have enacted rent-to-own legislation.[15] Only New Jersey, Wisconsin, and North Carolina have not. Hawkins, Rent-

---

[14]The Federal CLA, 15 U.S.C. § 1667(1), defines a "consumer lease" as one "for a period of time exceeding four months." The Massachusetts CLA defines a "consumer lease" as one "for a period of time of four months or less."

[15]See Ala. Code §§ 8.25.1-8.25.6 (LexisNexis 2002); Alaska Stat. §§ 45.35. 010-45.35.099 (LexisNexis 2008); Ariz. Rev. Stat. Ann. §§ 44.6802-44.6814 (West 2003 & Supp. 2008); Ark. Code Ann. §§ 4-92-101 to 4-92-107 (Lexis-Nexis 2001); Cal. Civ. Code §§ 1812.620-1812.649 (West 2009); Colo. Rev.

ing the Good Life, 49 Wm. & Mary L. Rev. 2041, 2052 n.37 (2008). See *Perez* v. *Rent-A-Center, Inc.*, 186 N.J. 188, *S.C.*, 188 N.J. 215 (2006), cert. denied, 549 U.S. 1115 (2007); *Burney* v. *Thorn Americas, Inc.*, 944 F. Supp. 762, 767 (E.D. Wis. 1996). Two of those three States, Wisconsin and New Jersey, have construed their retail instalment sales statutes to apply to rent-to-own transactions.[16] Because the Massachusetts CLA ap-

---

Stat. §§ 5-10-101 to 5-10-1001 (2002); Conn. Gen. Stat. §§ 42-240 to 42-253 (2009); Del. Code Ann. tit. 6, §§ 7601-7616 (2005); Fla. Stat. §§ 559.9231-559.9241 (West 2002); D.C. Code tit. 42, §§ 42-3671.01 to 42-3671.14 (West Supp. 2009); Ga. Code Ann. §§ 10-1-680 to 10-1-689 (2009); Guam Code Ann. §§ 57101-57114 (2005); Haw. Rev. Stat. §§ 481M-1 to 481M-17 (West 2008 & Supp. 2008); Idaho Code §§ 28-36-101 to 28-36-111 (Michie 2005); 815 Ill. Comp. Stat. §§ 655/0.01-655/5 (West 2008); Ind. Code §§ 24-7-1-1 to 24-7-5-5.5 (LexisNexis 2006 & Supp. 2008); Iowa Code §§ 537.3601-537.3624 (West 1997 & Supp 2009); Kan. Stat. Ann. §§ 50.680-50.690 (2005); Ky. Rev. Stat. Ann. §§ 367.976-367.985 (West 2008); La. Rev. Stat. §§ 9:3351-9:3362 (West 2009); Me. Rev. Stat. Ann. tit. 9-A, §§ 11-101 to 11-121 (West 1997 & Supp. 2008); Md. Code Ann., Com. Law, §§ 12-1101 to 12-1112 (LexisNexis 2005); Mich. Comp. Law Ann. §§ 445.951-445.970 (West 2002); Minn. Stat. Ann. §§ 325F.84-325F.97 (West 2004); Miss. Code Ann. §§ 75-24-151 to 75-24-175 (Lexis 2000); Mo. Rev. Stat. §§ 407.660-407.665 (2000); Mont. Code §§ 30-19-101 to 30-19-116 (2008); Neb. Rev. Stat. §§ 69-2101 to 69-2119 (LexisNexis 2007); Nev. Rev. Stat. §§ 597.010-597.110 (2007); N.H. Rev. Stat. Ann. §§ 358-P:1 to 358-P:12 (LexisNexis 2008); N.M. Stat. Ann. §§ 57-26-1 to 57-26-12 (2008); N.Y. Pers. Prop. Law §§ 500-507 (McKinney 1992); N.D. Cent. Code §§ 47-15.1-01 to 47-15.1-08 (Lexis 1999 & Supp. 2007); Ohio Rev. Code Ann. §§ 1351.01-1351.09 (West 2004); Okla. Stat. Ann., tit. 59, §§ 1950-1957 (2000); Or. Rev. Stat. Ann. §§ 646A.120-646A.134 (West Supp. 2009) (recodified); 42 Pa. Cons. Stat. Ann. §§ 6901-6911 (West 2004); P.R. Laws Ann. tit. 10, subtit. 3, c. 222, § 2451 (2004); R.I. Gen. Law §§ 6-44-1 to 6-44-10 (West 2006); S.C. Code Ann. §§ 37-2-701 to 37-2-714 (West 2002); S.D. Codified Laws §§ 54-6A-1 to 54-6A-10 (West 2004); Tenn. Code Ann. §§ 47-18-601 to 47-18-614 (LexisNexis 2001); Tex. Bus. & Com. §§ 92.001 to 92.160 (West 2009); Utah Code Ann. § 15-8-1 to 15-8-12 (LexisNexis 2005 & Supp. 2008); Vt. Stat. Ann. tit. 9, § 41b (LexisNexis 2006); Rule CF 115, Code of Vt. Rules, at 06031 015-1 (2007); Va. Code Ann. §§ 59.1-207.17 to 59.1-207.27 (LexisNexis 2006); Wash. Rev. Code §§ 63.19.010-63.19.901 (West 2005); W. Va. Code §§ 46B-1-1 to 46B-1-5 (LexisNexis 2006); Wyo. Stat. Ann. §§ 40-19-101 to 40-19-120 (LexisNexis 2009).

[16] In Minnesota, the Legislature amended the Minnesota Consumer Credit Sales Act, Minn. Stat. § 325G.15, subd. 5 (West 2004), to include rent-to-own transactions by defining the term "[s]ale of goods" to include "a contract in the form of a terminable bailment or lease of goods." Minn. Stat. § 325G.15. See *Fogie* v. *Thorn Americas, Inc.*, 95 F.3d 645 (8th Cir. 1996), cert. denied, 520 U.S. 1166 (1997); *Miller* v. *Colortyme, Inc.*, 518 N.W.2d 544 (Minn. 1994) ("By defining certain terminable leases as 'sales' within the [Consumer

plies directly to such transactions, and mindful that "general statutory language must yield to that which is more specific," *Risk Mgt. Found. of the Harvard Med. Insts., Inc.* v. *Commissioner of Ins.*, 407 Mass. 498, 505 (1990), we conclude that the reasoning of the Wisconsin and New Jersey courts lend little assistance in interpreting our different statutory scheme, and only briefly address it.

The Wisconsin Consumer Act, Wis. Stat. § 421.301(9) (West 2005 & Supp. 2008), contains a definition of "[c]redit sale" broader than the Massachusetts definition, because it considers the amounts a consumer actually "pays," rather than what he or she is obligated to pay. Wisconsin defines a "[c]redit sale" to include any "lease . . . if . . . the lessee *pays* or agrees to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the goods." Applying this definition, the United States District Court for the Eastern District of Wisconsin held that, by "expand[ing]" the definition of "credit sale," the Legislature intended the statute to apply to "two situations: where there is obligation and where the customer has made payments equal to the item's value." *Burney* v. *Thorn Americas, Inc.*, *supra*. The Wisconsin statute, unlike the Massachusetts CLA, defines "[c]redit sale" to include transactions in which the consumer "*has made* payments" equal to the item's value, regardless whether the agreement imposed any obligation to do so. *Id.* at 767-769. The Massachusetts definition of "retail installment sale" has no comparable definition.

New Jersey, like Wisconsin, has no specific rent-to-own statute. The Supreme Court of New Jersey concluded, however, that rent-to-own transactions, while "not a perfect fit with the words" of the New Jersey Retail Installment Sales Act, are nonetheless subject to its requirements. *Perez* v. *Rent-A-Center, Inc.*, 186 N.J. 188, 208 (2006). The New Jersey statute defines "retail installment contract" as follows:

> "This term includes a security agreement, chattel mortgage, conditional sales contract, or other *similar instru-*

Credit Sales Act], the legislature has made clear its intent to subject these terminable leases to the same consumer protection laws as ordinary credit sales"). The Massachusetts definition of "retail instalment sale agreement" does not include the term "terminable bailment or lease of goods."

*ment* in any contract for the bailment or leasing of goods by which the bailee or lessee agrees to pay as compensation a sum substantially equivalent to or in excess of the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming, the owner of such goods upon full compliance with the terms of such retail installment contract" (emphasis added).

N.J. Stat. Ann. 17:16C-1(b) (West 2000). The court concluded that, "[b]y including conditional sales, chattel mortgages, security interests, leases, and similar instruments within RISA's protective ambit, the Legislature signaled that it intended to sweep into the Act as many cognate agreements as possible, even those that did not strictly fall within a denominated category." *Perez* v. *Rent-A-Center, Inc., supra* at 209. The Supreme Court of New Jersey made it clear that the *Perez* decision changed the law in New Jersey, making that decision prospective in application, except for the remand proceedings. *Perez* v. *Rent-A-Center, Inc.,* 188 N.J. 215 (2006). The Massachusetts RISA statute does not include the words "or other similar instrument," and moreover, the Massachusetts CLA facially applies to such instruments. We decline to read into the RISA statute words or policy considerations that are not present.

2. *Conclusion.* The certified question concerns a specific rent-to-own agreement, executed by Jaaziel Costa. For the reasons stated, we answer the certified question by responding that a rent-to-own contract in the form of "Exhibit A" to the order of certification, entered into within the Commonwealth, is not subject to the Retail Instalment Sales Act, G. L. c. 255D. It may be subject to the terms of the Massachusetts Consumer Lease Act, G. L. c. 93, §§ 90-92, depending on the answers to unresolved factual questions outlined *supra.*

The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk, in turn, will transmit one copy under the seal of this court to the clerk of the United States District Court, District of Massachusetts, in answer to the questions certified, and will also transmit a copy to each party.

*So ordered.*

IRELAND, J. (concurring). I write separately because, although

I concur with the court's conclusion that the Retail Instalment Sales Act, G. L. c. 255D, does not apply to the type of rent-to-own agreement at issue here and that, if the agreements involve renting items for personal, family, or household use, the Consumer Lease Act, G. L. c. 93, §§ 90-92 (CLA), does apply, *ante* at 669-670, I want to emphasize that the CLA does not offer any type of protection for those consumers who ultimately purchase the merchandise they rent.

According to a study done by two researchers at the University of Massachusetts at Dartmouth and cited by the defendants, of those consumers who sign contracts to rent merchandise, such as the ones at issue here, over thirty-eight per cent result in an actual purchase either by renting for the term of the agreement or through an early purchase. Anderson, Rent-to-Own Agreements: Purchases or Rentals?, 20 J. Applied Bus. Res. 13, 15 (2004). Although this means that a majority of rental agreements are terminated before purchase, the study also found that agreements ending with the customer in possession of merchandise had eight times the duration time of those that ended in the return of merchandise, and that the median percentage of the total contract time that elapsed before an early purchase occurred was eighty-one per cent.[1] *Id.* at 20. The interest rate paid

---

[1] I rely on the study most favorable to the defendants, but other studies cited present a very different picture of the rent-to-own consumer. According to a Federal Trade Commission (FTC) study published in 2000, rent-to-own customers are more likely to be African-American, younger, and less educated, have lower incomes, have children in their households, and live in the South and in nonsuburban areas. Executive Summary, Survey of Rent-to-Own Customers, Federal Trade Commission Bureau of Economics Staff Report. The FTC study found that seventy per cent of rent-to-own merchandise was ultimately purchased by the customer. In addition, a study commissioned by one of the amici, the National Consumer Law Center, found that only one of the sixty-nine Rent-A-Center stores in Massachusetts is located in a census tract where less than five per cent of the population falls below one hundred per cent of the Federal Poverty Level (as determined by the 2000 census), suggesting a targeting of poorer rather than wealthier areas of the Commonwealth.

The University of Massachusetts researchers posit that the methodology of the FTC study (i.e., interviews) was flawed. Their study instead analyzed transactional data made available from the Association of Progressive Rental Organizations. Whatever its alleged flaws, the United States Department of Defense relied, in part, on the FTC study, when it reported to Congress. See Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents 19-20 (Aug. 9, 2006).

by this not insignificant number of customers who ultimately purchase the rented merchandise is extremely high. For example, one of the named plaintiffs in this putative class action, Jaaziel Costa, falls near the median of total contract time that elapsed before purchase that was found by the University of Massachusetts study. Costa exercised an early purchase option after approximately sixty-four weeks of an eighty-two week contract (i.e., approximately seventy-eight per cent of his contract time). He ended up paying slightly less than one hundred per cent interest for a computer that was used when he first rented it.[2]

I am aware, as the defendants argue, that many rent-to-own customers use this type of agreement because they cannot get credit elsewhere. However, because of the way the agreements are structured, it is clear that those consumers who ultimately purchase the merchandise fall outside the CLA's statutory protection and can be subject to terms that the United States Department of Defense, as part of a 2006 report to Congress, called "predatory lending practices." See Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents 19-20 (Aug. 9, 2006). I am hopeful that the Legislature will consider whether, as a matter of public policy, a balance might be struck between allowing businesses that provide these rent-to-own services to make a profit and offering protection to those customers who end up purchasing rented merchandise at extremely high interest rates.[3]

---

[2]At the time Costa signed his agreement the purchase price of the used computer was listed as $1,434.59. The price he paid as an early purchaser was $2,718.34. The purchase price of an item that is listed in a rent-to-own agreement "most often is unrelated to fair market value. Consequently, the 'total cost to own' may be double the 'cash price' of the goods but effectively four times the true market value of the goods acquired." Drysdale, The Two-Tiered Consumer Financial Services Marketplace: The Fringe Banking System and Its Challenge to Current Thinking About the Role of Usury Laws in Today's Society, 51 S.C. L. Rev. 589, 615-616 & n.148 (2000).

[3]Recently, the Congress has acted to reform credit card practices. In May, 2009, the president signed the Credit Card Accountability, Responsibility and Disclosure Act of 2009, a law protecting credit card holders by requiring, among other things, plain language disclosures and banning unfair interest rate increases and fee traps.